# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARK GOTTSLEBEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>   v.<br><br>INFORMA MEDIA, INC. F/K/A PENTON MEDIA, INC.,<br><br>          Defendant. | Case No. 1:22-cv-00866-HYJ-RSK<br><br>Hon. Hala Y. Jarbou<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

**STATEMENT OF ISSUES PRESENTED**

1.    Does the six-year limitation period found in M.C.L. § 600.5813 govern Plaintiff's statutory claim for violation of the PPPA – a statute that promulgates a cause of action never before recognized at common law and which does not itself specify a limitation period?

**Plaintiff's Answer: Yes.**

2.    Was the limitation period applicable to Plaintiff's PPPA claim tolled for 101 days between March 10, 2020 and June 20, 2020 pursuant to Executive Orders 2020-58 and 2020-122 issued by the Governor of Michigan and Administrative Orders 2020-3 and 2020-18 issued by the Michigan Supreme Court?

**Plaintiff's Answer: Yes.**

3.    Are the First Amended Class Action Complaint's factual allegations that Defendant, during the relevant pre-July 31, 2016 time period, disclosed "Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives," as well as "rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact [Defendant's] subscribers, without first obtaining the requisite written consent from Plaintiff" (*see* First Amended Class Action Complaint (ECF No. 16) at ¶ 17) – allegations which are bolstered by screenshots of and citations to Defendant's data card, press-release materials, and privacy policy in which it admits to disclosing its customers' Private Reading Information – sufficient to plausibly suggest an entitlement to relief under the version of Michigan's Preservation of Personal Privacy Act in effect through July 30, 2016?

**Plaintiff's Answer: Yes.**

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

M.C.L. § 600.5813

Fed. R. Civ. P. 8

*Carter v. DTN Mgmt. Co.*, --- N.W.2d ---, 2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023)

*Krassick v. Archaeological Inst. Of Am.*, 2022 WL 2071730 (W.D. Mich. June 9, 2022)

*Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022)

*Hall v. Farm Journal, Inc.*, No. 21-cv-11811, ECF No. 26 (E.D. Mich. Apr. 5, 2022)

*Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017)

*Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018)

*Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016)

*Nat'l Credit Union Admin. Bd. V. Zovko*, 2016 WL 9778195 (N.D. Ohio July 8, 2016)

Mich. Executive Order 2020-58

Mich. Executive Order 2020-122

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.................................................................. i

CONTROLLING AND MOST APPROPRIATE AUTHORITIES........................ ii

TABLE OF CONTENTS...................................................................... iii

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ...........................................................................1

THE PPPA ......................................................................................4

FACTUAL ALLEGATIONS OF THE COMPLAINT ............................................5

ARGUMENT ...............................................................................10

   I.    Plaintiff's Claim Is Governed by a Six-Year Limitation Period That Was
Tolled for 101 Days Pursuant to the COVID-19 Orders ............................10

   II.   The FAC Adequately Alleges That Defendant Disclosed Plaintiff's Private
Reading Information in Violation of the PPPA Between June 11, 2016 and
July 30, 2016 ...........................................................................17

CONCLUSION ...........................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Blaha v. A.H. Robins & Co.*,
  708 F.2d 238 (6th Cir. 1983) ..................................................................12

*Boelter v. Advance Mag. Publishers Inc.*,
  210 F. Supp. 3d 579 (S.D.N.Y. 2016) ....................................................19

*Boelter v. Hearst Commc'ns, Inc.*,
  192 F. Supp. 3d 427 (S.D.N.Y. 2016) .......................................... 1, 13, 19

*Boelter v. Hearst Commcn's, Inc.*,
  269 F. Supp. 3d 172 (S.D.N.Y. 2017) ....................................................17

*Bowles v. Sabree*,
  2022 WL 141666 (E.D. Mich. Jan. 14, 2022) ........................................12

*Bownes v. Borroughs Corp.*,
  2021 WL 1921066 (W.D. Mich. May 13, 2021)......................................12

*Browning v. Buko*,
  979 N.W.2d 196 (Mich. 2022) ...............................................................14

*Cain v. Redbox Automated Retail, LLC*,
  981 F. Supp. 2d 674 (E.D. Mich. 2013) .................................................26

*Carter v. DTN Mgmt. Co.*,
  --- N.W.2d ---, 2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023)............... 15, 16

*China Agritech, Inc. v. Resh*,
  138 S. Ct. 1800 (2018)............................................................................3

*Coulter-Owens v. Time Inc.*,
  695 F. App'x 117 (6th Cir. 2017)............................................................13

*DelValle v. Informa Media, Inc*,
  No. 22-cv-00132 (W.D. Mich.)...............................................................3

*Doe v. Michigan State Univ.*,
  989 F.3d 418 (6th Cir. 2021) ..................................................................25

*Foman v. Davis*,
  371 U.S. 178 (1962) ...............................................................................34

*Hall v. Farm Journal, Inc.*,
  Case No. 2:21-cv-11811 (E.D. Mich. Apr. 5 2022) ..................................... 10, 11

*Horton v. GameStop Corp.*,
  380 F. Supp. 3d 679 (W.D. Mich. 2018)........................................... 1, 19, 25, 29

*Howard v. Onion*,
  2022 WL 2065950 (6th Cir. May 17, 2022).............................................12

*In re Certified Question: Deacon v. Pandora, Inc.*,
  885 N.W.2d 628 (Mich. 2016) ...............................................................13

*Krassick v. Archaeological Institute of Am.*,
    2022 WL 2071730 (W.D. Mich. June 9, 2022)............................................. 10, 11
*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ................................................................................1
*Mackey v. Rising*,
    2021 WL 4034226 (E.D. Mich. Sept. 3, 2021) ....................................................12
*McVay v. Harvard Business Publishing Corp.*,
    No. 1:22-cv-00802-HYJ-RSK (W.D. Mich.) ....................................................13
*Moeller v. Am. Media, Inc.*,
    235 F. Supp. 3d 868 (E.D. Mich. 2017) .............................................................19
*Nashel v. The New York Times Co.*,
    2022 WL 6775657 (E.D. Mich. Oct. 11, 2022) .......................................... passim
*Nat'l Credit Union Admin. Bd. v. Zovko*,
    2016 WL 9778195 (N.D. Ohio July 8, 2016).....................................................33
*Perlin v. Time Inc.*,
    237 F. Supp. 3d 623 (E.D. Mich. 2017) .............................................................19
*Pratt v. KSE Sportsman Media, Inc.*,
    586 F. Supp. 3d 666 (E.D. Mich. 2022) ............................................ 2, 10, 11, 16
*Smith v. Hilliard*,
    578 F. App'x 556 (6th Cir. 2014)......................................................................12
*Straus v. Governor*,
    592 N.W.2d 53 (Mich. 1999) ..........................................................................11
*Wallace v. Kato*,
    549 U.S. 384 (2007) ........................................................................................12
*Wheaton v. Apple Inc.*,
    2019 WL 5536214 (N.D. Cal. Oct. 25, 2019)....................................................26
*Wheaton v. Apple Inc.*,
    Case No. 19-cv-02883 (N.D. Cal. Sept. 20, 2019).............................................27
*Zimmerman v. 3M Co.*,
    542 F. Supp. 3d 673 (W.D. Mich. 2021).............................................................17

**Statutes**

H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989)............................1
H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4, 5 (Mich. 1988) .................1
H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West) ................................................5
M.C.L. § 600.5813 ....................................................................................... 2, 10, 11
S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016)
    (codified at M.C.L. § 445.1711, *et seq*.) ...............................................................1

**Other Authorities**

Mich. Executive Order 2020-122 ...........................................................................11
Mich. Executive Order 2020-58 .............................................................................11
Mich. Supreme Court Administrative Order 2020-18 ............................................11
Mich. Supreme Court Administrative Order 2020-3 ..............................................11
*Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B.
    No. 5331, Jan. 20, 1989 .......................................................................................5

**Rules**

Fed. R. Civ. P. 8 ....................................................................................... 17, 25, 33
Fed. R. Civ. P. 12(b)(6)................................................................................. 25, 33

Plaintiff Mark Gottsleben submits this response in opposition to Defendant's Motion to Dismiss (ECF No. 20-1 (the "Motion" or "Mot.")) the First Amended Complaint (ECF No. 16 ("FAC")).

## INTRODUCTION

In this putative consumer class action, Plaintiff alleges that Defendant violated Michigan's Preservation of Personal Privacy Act ("PPPA")[1] by disclosing, without his consent, information that identified him as (*inter alia*) a subscriber to Defendant's *Michigan Farmer* magazine. On behalf of himself and others similarly situated, Plaintiff seeks to recover $5,000, as provided by the PPPA, for each of Defendant's statutory violations.

Defendant moves to dismiss the FAC on two grounds: (1) Plaintiff's PPPA claim was not tolled pursuant to Governor Whitmer's Executive Orders or the

---

[1]    The PPPA (occasionally referred to in the caselaw as the "Video Rental Privacy Act" or the "VRPA") is found at H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989). In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

Michigan Supreme Court's Administrative Order tolling the statute of limitations for all Michigan claims due to COVID-19 (together, the "COVID-19 Orders"), and is therefore time-barred by the six-year limitation period found in Michigan Compiled Laws ("M.C.L.") § 600.5813; and (2) Plaintiff fails to adequately allege that Defendant disclosed his Private Reading Information to third parties during the relevant time period.

First, as Defendant effectively concedes in the Motion, it is well established that "[a] six-year statute of limitations applies to PPPA claims." *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 673 (E.D. Mich. 2022). Four federal district courts in Michigan (in both the Eastern and Western Districts), ***including this Court***, have uniformly held that PPPA claims are subject to the six-year period found in section 600.5813 (not the three-year period found in section 600.5805(2)). This Court should adopt the reasoning of its prior decision on the same issue and hold that section 600.5813's six-year limitation period governs Plaintiff's claim. Moreover, that six-year period was tolled for 101 days pursuant to the COVID-19 Orders, thus rendering any disclosures of Plaintiff's personal information that occurred between June 11, 2016 (six years plus 101 days before the date on which this action was initiated) and July 30, 2016 (the last date that the unamended version of the PPPA that Plaintiff invokes in this case was in effect) actionable in this case.

2

Second, Plaintiff adequately states a claim for violation of the PPPA that accrued between June 11, 2016 and July 30, 2016.[2] The FAC specifically alleges that, "during the relevant pre-July 31, 2016 time period," Defendant "continuously" and "at least as frequently as once a month," "rent[ed], exchang[ed], or otherwise disclos[ed] the Private Reading Information of its entire database [of] its Michigan-based subscribers," inclusive of "Plaintiff's Private Reading Information," to various third parties, including "data aggregators, data appenders, data cooperatives, and list

---

[2]    Although Plaintiff additionally contends that the limitation period was tolled for an additional 57 days during the pendency of *DelValle v. Informa Media, Inc*, No. 22-cv-00132 (W.D. Mich.), a prior action brought on behalf of the same putative class at issue here (*see* FAC ¶ 1 n.1), the Court need not reach this additional basis for tolling in order to deny the Motion because the six-year limitation period, with the benefit of tolling pursuant to the COVID-19 Orders, is of a sufficient duration for the Court to conclude that Plaintiff has adequately stated a claim for relief that accrued within that timeframe, as discussed further below. Nonetheless, Plaintiff incorporates herein in its entirety the discussion of this issue in footnote 1 to the FAC, and additionally notes that the U.S. Supreme Court's decision in *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1806 (2018), cited in footnote 7 on page 12 of the Motion, PageID.1170, has no applicability in this case for several reasons, including that *China* Agritech's holdings are limited to federal causes of action, like the federal securities claims at issue in that case (this is because statutes of limitation and the tolling doctrines that go along with them are matters of state substantive law), and because even in that limited context, the decision's holdings are inapplicable unless the prior action was dismissed following a denial of class certification. Here, the statute in question is a Michigan state statute, and class certification was not denied in the *DelValle* action. Plaintiff is happy to address this issue further at the appropriate stage of the litigation should the Court find it necessary; but at this stage of the proceedings, the issue need not be addressed to resolve the Motion because the FAC adequately states a claim that accrued within the applicable limitation period as tolled by the COVID-19 Orders, as discussed further below.

brokers, among others," all without its subscribers' consent. And the FAC shoves these allegations across the line of plausibility by attaching a screenshot depicting Defendant's publicly accessible "data card" in existence today, which offers for sale Defendant's customers' Private Reading Information "THROUGH 05/19/2021", and by alleging that the same data card also existed throughout the relevant pre-July 31, 2016 time period. Additionally, the FAC cites to and attaches as exhibits several publicly available copies of Defendant's privacy policy and various press releases and news articles from before or within the relevant pre-July 31, 2016 time period (in which the company also admits to disclosing its customers' Private Reading Information), many of which were cached by and located in the archives of the Wayback Machine Internet Archive (archive.org). Moreover, the FAC alleges that, "[a]s a result of [Defendant's practices of] disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox . . . over the same time period." Taken together, these factual allegations – which are well-pled and must be accepted as true at this stage of the proceedings – easily state a claim for relief under the PPPA.

The FAC states a timely claim for relief, and the Motion should be denied.

## THE PPPA

In 1988, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials" by prohibiting

companies from disclosing certain types of sensitive consumer information. H.B.

No. 5331, 1988 Mich. Legis. Serv. 378 (West). Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

Michigan's passage of the PPPA established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989. *See* FAC, Ex. J.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

Up until November 2012, *Michigan Farmer* magazine was owned and operated by Farm Progress, a division of Fairfax Media. FAC ¶ 3. In November 2012, Penton Media, Inc. purchased Farm Progress, including *Michigan Farmer* magazine, from Fairfax Media. *Id.* In September 2016, Informa PLC acquired Penton Media, Inc., including *Michigan Farmer* magazine, and subsequently changed the name of Penton Media, Inc. to Informa Media, Inc. *Id.* ¶ 9. Thus, during the relevant pre-July 31, 2016 time period, *Michigan Farmer* magazine was operated by Penton Media, Inc., now known as Informa Media, Inc., the defendant in this

case. *Id.* Penton Media, Inc. and Informa Media, Inc. are collectively referred to herein as the "Defendant."[3]

Defendant maintains a vast digital database comprised of all its customers' Private Reading Information. *Id.* ¶ 49. Since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period, Defendant continuously transmitted its entire database of its customers' Private Reading Information to data appenders and aggregators at least as frequently as once a month, as well as to other third party renters and exchangers on a regular basis over the same time period. *Id.* ¶¶ 1, 6, 13 & *id.*, Exs. A, E.

Indeed, over that period of time, Defendant disclosed Plaintiff's and all of its other subscribers' Private Reading Information in at least three ways. *Id.* ¶¶ 1, 6, 13, 68. First, Defendant disclosed mailing lists containing Plaintiff's (along with all its other subscribers') Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases before sending the mailing lists back to

---

[3]    In the Motion, Defendant repeatedly refers to Penton as "Defendant's predecessor." *See, e.g.*, Mot. at 6, 7, 15, PageID.1164, 1165, 1173. That is misleading, because it suggests Informa Media, Inc. (the Defendant in this case) is a distinct legal entity from Penton Media, Inc. In reality, the opposite is true: Penton and Informa are one in the same because Penton Media, Inc. simply changed its name to Informa Media, Inc. in 2018. *See* FAC ¶ 9; *see also id.*, Ex. I.

Defendant. *Id.* ¶¶ 49, 69; *see also id.* ¶ 6 & *id.*, Ex. E.[4] Second, Defendant disclosed mailing lists containing Plaintiff's (along with all its other subscribers') Private Reading Information to data cooperatives, who in turn gave Defendant access to their own mailing list databases. *Id.* ¶¶ 51, 70. And third, Defendant rented and/or exchanged its mailing lists containing Plaintiff's (along with all its other subscribers') Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes. *Id.* ¶¶ 50, 71. As a result of Defendant's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Defendant that identify its customers by their most intimate details such as their job title, number of employees, livestock type, sales volume, and farm annual income. *Id.* ¶ 52. Defendant's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious

---

[4]     On December 10, 2015, Defendant announced the launch of its SmartReach "Audience Extension" service, which at the time was described as "provid[ing Defendant's clients] the ability to precisely target audiences through deep data sets that provide intelligence across more than 1,000 key firmographic and demographic differentiators. Marketers can hypertarget ad messages to reinforce branding and drive greater conversion for email and website campaigns through a best practices approach, so ads are displayed wherever a potential customer travels online." FAC ¶ 6 & *id.*, Ex. E. Defendant was able to provide these services by utilizing data appending and aggregation services provided by other companies, which necessarily required it to transmit its entire database of all of its subscribers' Personal Reading Information to third party data companies for enhancement. FAC ¶ 6.

harm from scammers. *Id.*

Defendant did not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information has been rented and exchanged on the open market. *Id.* ¶ 53.

The FAC includes a screenshot of a "data card" titled "US Agriculture Masterfile (formerly Agbase) from Informa Mailing List" – which, as of the filing of this action, was publicly available on list broker NextMark, Inc.'s website. In the data card, Defendant offers to rent or exchange the Private Reading Information of all of its subscribers – with "COUNTS THROUGH 05/19/2021" – to anyone interested in purchasing it. *Id.* ¶ 2, Ex. A.[5] As shown in the screenshot of the data

---

[5]    Defendant says that "Plaintiff's 'screenshot' is incomplete in that it does not show the entire webpage, including the URL, date of the screenshot, and owner of the website." Mot. at 8 n.4, PageID.1166. Although Defendant appears to be trying to apply a standard for the admissibility of evidence that plainly does not apply at this stage of the litigation, Plaintiff has nonetheless attached a complete copy of the data card as **Exhibit A** to this brief, and notes that the data card reflected in this Exhibit was accessed by his counsel at the following URL: https://lists.nextmark.com/market?page=order/online/datacard&id=404966, and that it was saved by his counsel on June 19, 2022 at 8:35 PM EST. Notably, after this litigation was commenced, the webpage containing the data card was taken offline; if the page is accessed today, the following error is displayed: "HTTP Status 404 - The requested content is not available. . . ."

Oddly, Defendant then states that "[a] similar 'data' card currently available on NextMark's website can be seen here: https://lists.nextmark.com/market?page=order/online/datacard&id=334081&trk=y&aId=1381." But this appears to be yet another attempt to mislead the Court, as the data card accessible via that hyperlink

card, the list offered for rental or exchange by Defendant also contains myriad other categories of individualized data and demographic information about each subscriber listed, such as job title, number of employees, livestock type, sales volume, and farm annual income – data which is also available for rental or exchange for additional charges. *See id.* ¶¶ 2, 13 & *id.*, Ex. A.

The same or a substantially similar "data card" as the one shown in Ex. A to the FAC, with the same or similar rates and advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by Defendant as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period – thus demonstrating that Defendant was renting, selling, exchanging, and otherwise disclosing all of its customers' Private Reading Information (including Plaintiff's and all Class members' Private Reading Information) to third parties during the relevant pre-July 31, 2016 time period. *Id.* ¶ 2.

Thus, Defendant was continuously renting, exchanging, and otherwise disclosing all of its customers' Private Reading Information (including Plaintiff's and all Class members' Private Reading Information) to third parties during the relevant pre-July 31, 2016 time period. *Id.* ¶¶ 1, 13, 68-80. As a result of Defendant

---

pertains to an altogether different data card and is not the data card attached to the FAC and does not concern Defendant's subscriber database.

disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox following his purchase of a subscription to *Michigan Farmer* over the same time period. *Id.* ¶¶ 1, 10.

By renting, exchanging, or otherwise disclosing the Private Reading Information of Plaintiff and its other Michigan-resident subscribers during the relevant pre-July 31, 2016 time period, Defendant violated the PPPA. *Id.* ¶¶ 11, 80. Plaintiff seeks $5,000.00 for himself and each Class member pursuant to PPPA § 5(a) and costs and reasonable attorneys' fees pursuant to PPPA § 5(b). *Id.* ¶ 81.

## ARGUMENT

The COVID-19 Orders extended the limitation period applicable to Plaintiff's and the Class's claims by 101 days. And with the benefit of such tolling, the FAC plausibly states a claim for relief that accrued during the six-year limitation period applicable to a PPPA claim. The Motion should be denied.

### I.    Plaintiff's Claim Is Governed by a Six-Year Limitation Period That Was Tolled for 101 Days Pursuant to the COVID-19 Orders

A six-year limitation period governs the PPPA claim alleged in the FAC, and that claim was tolled for 101 days by the COVID-19 Orders.

As a threshold matter, the Eastern and Western Districts of Michigan are in unanimous agreement that "the six-year statute of limitations in [M.C.L.] § 600.5813 governs a PPPA claim." *Krassick v. Archaeological Inst. of Am.*, 2022 WL 2071730,

10

at *5 (W.D. Mich. June 9, 2022) (Jarbou, J.); *Pratt*, 586 F. Supp. 3d at 673 (Ludington, J.) ("A six-year statute of limitations applies to PPPA claims."); *Hall v. Farm Journal, Inc.* (Lawson, J.), Case No. 2:21-cv-11811 (E.D. Mich. Apr. 5, 2022) ("The plaintiff's claim is governed by Section 5813, and therefore, the claim appears to be timely for the purpose of this motion.") (**Exhibit B** hereto at p. 19). No court has ever decided this question—i.e., whether a PPPA claim is governed by a six-year limitation period or a three-year period—in favor of the three-year period. Indeed, even the *Nashel* decision thoroughly considered and rejected the same arguments made by Defendant here in holding that a six-year statute of limitations applies to PPPA claims. *See Nashel v. New York Times Co.*, 2022 WL 6775657, at *3-4 (E.D. Mich. Oct. 11, 2022). This Court should adopt the reasoning of its decision in *Krassick*, which is in accord with the decisions in *Pratt* and *Hall* (as well as the subsequently issued decision in *Nashel*, on the issue of the statute of limitations only), and hold that the six-year limitation period found in section 600.5813 governs Plaintiff's PPPA claim.

Additionally, the six-year limitation period governing Plaintiff's claim was tolled for 101 days from March 10, 2020, through June 20, 2020, pursuant to the COVID-19 Orders. *See* Mich. Executive Order 2020-58; Mich. Supreme Court Administrative Order 2020-3; *see also* Mich. Executive Order 2020-122; Mich. Supreme Court Administrative Order 2020-18.

Under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation." *Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999). "Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal courts sitting in diversity." *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983). "Just as limitations periods are taken from state law, so are the rules regarding tolling." *Smith v. Hilliard*, 578 F. App'x 556, 562 (6th Cir. 2014) (citing *Wallace v. Kato*, 549 U.S. 384, 394 (2007)) ("We have generally referred to state law for tolling rules, just as we have for the length of statutes of limitation."). Thus, because the *Erie* doctrine requires this Court to apply Michigan statute of limitations and tolling rules, and because the COVID-19 Orders have the same status as enacted legislation under Michigan law, the Court is compelled to apply the COVID-19 Orders and find that the statute of limitations was tolled from March 10, 2020, to June 20, 2020.

Courts in both Michigan District Courts have held that the COVID-19 Orders toll the statute of limitations for Michigan state-law claims. *See Bownes v. Borroughs Corp.*, 2021 WL 1921066, at *2 (W.D. Mich. May 13, 2021) ("the Michigan Supreme Court tolled the statutes of limitations in Michigan for at least 100 days due to the COVID-19 pandemic" and thus "filers shall have the number of days to submit their filings on June 20, 2020, as they had when the exclusion went into effect on March 23, 2020"); *Mackey v. Rising*, 2021 WL 4034226, at *2 (E.D.

Mich. Sept. 3, 2021) (same); *Bowles v. Sabree*, 2022 WL 141666, at *9 (E.D. Mich. Jan. 14, 2022) (same); *see also, e.g.*, *Howard v. Onion*, 2022 WL 2065950, at *2 (6th Cir. May 17, 2022) (concluding same under Ohio law).

Without citing to any legal authority, Defendant argues that "[t]he Executive Order extended by 101 days the time for filing a claim," but "it certainly did not (and did not purport to) extend the cause of action for statutory damages." Mot. at 11, PageID.1169.[6] According to Defendant – again, without citing to any legal authority – "an executive order could not override or extend the legislature's termination of causes of action for statutory damages," and "[t]hus, on its face, the Executive Order applies only to the commencement of *claims* rather than extension of certain remedies found in causes of action." *Id.* (emphasis added). That makes no sense. The only thing Defendant cites to in support of this argument is the amendment to the PPPA that became effective on July 31, 2016 (after the time period at question in this action), *see* Mot. at 11 n.6, PageID.1169 – an amendment that the Sixth Circuit, the Michigan Supreme Court, and numerous federal district courts across the country have uniformly held does not apply retroactively. *See Coulter-Owens v. Time Inc.*, 695 F. App'x 117, 121 (6th Cir. 2017); *In re Certified Question: Deacon v. Pandora,*

---

[6]    It is worth noting that nearly the entire section of Defendant's Motion pertaining to the COVID-19 Orders follows verbatim a motion to dismiss prepared by other attorneys on behalf of a different defendant, in the action *McVay v. Harvard Business Publishing Corp.*, No. 1:22-cv-00802-HYJ-RSK (W.D. Mich.). *Compare, e.g.*, Mot. at 11, PageID.1169 *with McVay*, No. 1:22-cv-00802 PageID.1111-12.

*Inc.*, 885 N.W.2d 628, 630-31 & n.7-8 (Mich. 2016); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016). Because the amendment to the statute does not apply retroactively, the unamended statute that Plaintiff invokes in this case plainly permits the recovery of statutory damages. *See* PPPA § 5(a).

Defendant then mounts an attack against the Michigan Supreme Court's COVID-19 tolling Administrative Order, but this too is unavailing. Relying on a dissenting opinion only, Defendant argues that COVID-19 tolling does not apply because "the Michigan Supreme Court lacks authority" to toll statutes of limitation. *See* Mot. at 11-12, PageID.1169-70 (citing *Browning v. Buko*, 979 N.W.2d 196 (Mich. 2022) (Viviano, J., dissenting)). But, of course, the dissenting opinion does not control; the majority opinion does. And the Michigan Supreme Court majority declined to even consider the appellate court's decision to deny interlocutory appeal to consider the question. *Id.*; *see also id.* at 198 (explaining underlying procedural posture where probate court applied COVID-19 tolling and appellate court declined to grant interlocutory appeal). Simply put, there is no basis to decline to apply the Michigan Supreme Court's COVID-19 tolling Administrative Order. But even if the Michigan Supreme Court's COVID-19 tolling Administrative Order did not apply (and it does), Governor Whitmer separately issued an Executive Order tolling the statute of limitations for all claims due to COVID-19 as well. *See* Mich. Executive Order 2020-58. As aforementioned, under Michigan law "the Governor's action [in

issuing an Executive Order] has the status of enacted legislation." *Straus*, 592 N.W.2d at 57. Thus, apart from the Michigan Supreme Court's Administrative Order, Governor Whitmer's Executive Order also applies and commands that the Court apply COVID-19 tolling.

Notably, On January 26, 2023, the Michigan Court of Appeals issued a published decision on a case concerning the effect of the Michigan Supreme Court's COVID-19 emergency administrative orders on determining court filing deadlines. *See Carter v. DTN Mgmt. Co.*, --- N.W.2d ---, 2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023) (examining tolling of statute of limitations under Administrative Orders 2020-3 and 2020-18) (attached as **Exhibit C**). In *Carter*, the defendant argued and the trial court held that AO 2020-3 applied only to cases whose filing deadlines expired during the state of emergency, and that the Michigan Supreme Court has no authority to modify or toll the statute of limitations. *Carter*, 2023 WL 439760, at *2-4. The Court of Appeals rejected the argument, holding that the COVID-19 Orders "broadly excluded any day within the state of emergency '*for purposes of determining the deadline* applicable to the commencement of all *civil* and probate case types under MCR 1.108(1)." *Carter*, 2023 WL 439760, at *3 (emphasis in *Carter*) (citing AO 2020-18); *see also id.* ("Contrary to the trial court's conclusion, the Supreme Court did not exclude only deadlines that fell during the state of emergency. Rather, it more broadly excluded *any day* within the state of

15

emergency '*for purposes of determining the deadline* applicable to the commencement of *all* civil and probate case types under MCR 1.108(1).'" (citing AO 2020-3, emphasis in *Carter*)). Finally, the *Carter* court also rejected the notion that the Administrative Orders are ineffective because the Michigan Supreme Court has no authority to modify or toll the statute of limitations. *Carter* held that "[t]he Supreme Court has constitutional authority to 'establish, modify, amend, and simplify the practice and procedure in all courts of this state.'" *Id.* at 4 (citing Mich. Const. 1963, art. 6, § 5).

Just like in *Carter*, the six-year limitation period applicable to Plaintiff's claim was tolled for 101 days from March 10, 2020 through June 20, 2020, such that – even without the benefit of tolling from the prior *DeValle* action – any disclosure of Plaintiff's Private Reading Information by Defendant between June 11, 2016[7] and July 30, 2016 is actionable in this case. *See, e.g.*, *Carter*, 2023 WL 439760, at *3 ("conclud[ing] that plaintiff's complaint was timely filed," explaining: "On March 10, 2020, plaintiff had 10 months left to file her complaint. Accordingly, she had that same amount of time to file beginning on June 20, 2020.").

---

[7]    Six years is 2,190 days. Six years plus 101 days is 2,291 days. And the 2,291st day prior to September 19, 2022 (the date the original Complaint was filed in this action) was June 11, 2016. *See Pratt*, 586 F. Supp. 3d at 675 n.6 (calculating limitation period the same way).

## II.   The FAC Adequately Alleges That Defendant Disclosed Plaintiff's Private Reading Information in Violation of the PPPA Between June 11, 2016 and July 30, 2016

Defendant argues that the FAC "presents no facts to plausibly suggest that Defendant unlawfully disclosed Plaintiff's Private Reading Information to third-parties in violation of the PPPA." Mot. at 12, PageID.1170. The argument is without merit. The FAC's allegations plausibly demonstrate that Defendant disclosed Plaintiff's Private Reading Information in violation of the PPPA during the relevant pre-July 31, 2016 time period.

Review of the FAC is governed by the liberal Rule 8 pleading standard. Plaintiff is not required to prove his claim with evidence at this time. He must merely allege facts that plausibly suggest Defendant violated the PPPA. *See, e.g.*, *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021).

"The Michigan [PPPA] prohibits a person, and an employee or agent of the person, engaged in the business of selling at retail books or other written materials, from disclosing to any person, other than the customer, a record or information concerning the purchase of those materials by a customer that indicates the identity of the customer." *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 177-78 (S.D.N.Y. 2017) (quoting PPPA § 2) (cleaned up).[8]

---

[8]    The Motion, incredibly, actually cites to, and its arguments rely on, the wrong version of the statute. Specifically, Defendant asserts:

The FAC alleges that during the relevant pre-July 31, 2016 time period, Defendant disclosed the Private Reading Information of its Michigan-based subscribers, including Plaintiff and all Class members, to various third-parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. FAC ¶¶ 1-2, 6, 13, 49-53, 68-80. The FAC alleges that Defendant "continuously engaged" in these practices (disclosing Defendant's entire database of its customers' Private Reading Information to third parties), "at least as frequently as once a month," for the duration of the relevant pre-July 31, 2016 time period. *Id.* ¶ 13. The FAC corroborates these allegations by also alleging facts showing that

---

To state a claim under the prior version of the PPPA, the plaintiff must plead facts indicating that (i) the defendant knowingly disclosed personally identifying reading information about the plaintiff (ii) to any person (iii) without notice or permission. M.C.L. §§ 445.1712, 445.1713 (1989) (barring "knowing" disclosure "to any person, other than the customer, a record or information concerning the purchase . . . of [written] materials by a customer that indicates the identity of the customer" except "for the exclusive purpose of marketing goods and services directly to the consumer" with "written notice" and opportunity to opt out).

Mot. at 12, PageID.1170. The version of the statute at issue in this case is the pre-July 31, 2016 version. The version Defendant cites to and quotes from on page 12 of the Motion is the amended version of the statute that became effective on July 31, 2016. Among other significant differences between the two versions of the statute, the unamended version at issue here did not, as Defendant incorrectly asserts, impose any requirement that a disclosure be "knowing" in order to trigger liability. *See* https://www.legislature.mi.gov/documents/2015-2016/billconcurred/Senate/pdf/2015-SCB-0490.pdf (version of bill amending the statute that passed both houses of the Michigan legislature and was enacted into law, with changes from the original version appearing in redline).

Defendant's entire customer database (containing the personal, PPPA-protected data pertaining to all of its customers, including Plaintiff and each Class member) has been advertised by Defendant for rental and exchange on the open market since as far back as 2015 and throughout the relevant pre-July 31, 2016 time-period, *see id.* ¶ 6 & *id.*, Ex. E (concerning Defendant's SmartReach service launched in 2015) & *id.* ¶ 8 (concerning admissions in Defendant's privacy policy updated on March 11, 2015), and that over the same time period Defendant in fact routinely disclosed that entire customer database to various third-parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. FAC ¶¶ 1-2, 6, 13, 49-53, 68-80. Plaintiff bolsters these factual allegations by including a screenshot of a data card posted on data-broker Nextmark's website that offers "renters access to the mailing list titled 'US Agriculture Masterfile (formerly Agbase) from Informa Mailing List', which contains the Private Reading Information" of all of Defendant's subscribers. *Id.* ¶ 2 & *id.*, Ex. A. This data card indicates that the data is cumulative of all subscribers, with "COUNTS THROUGH 05/19/2021." *Id.*

Numerous courts across the country, including in this District, have held such factual allegations sufficient to state a claim for a violation of the PPPA. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 642 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*,

235 F. Supp. 3d 868, 873 (E.D. Mich. 2017); *Hearst*, 192 F. Supp. 3d at 453; *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 590 (S.D.N.Y. 2016).

But the FAC does not stop there. The FAC pushes these allegations across the line of plausibility by alleging that the same data card attached as Ex. A to the FAC also existed throughout the relevant pre-July 31, 2016 time period, FAC ¶ 2, and by citing to and attaching as exhibits several publicly available copies of Defendant's privacy policy and various press releases and news articles issued by and containing comments from Defendant from before the relevant pre-July 31, 2016 time period (in which the company also admits to disclosing its customers' Private Reading Information), many of which were cached by and located in the archives of the Wayback Machine Internet Archive (archive.org). FAC ¶¶ 4-9 & *id.*, Exs. C-I. Moreover, the FAC alleges that "[a]s a result of [Defendant's] practices of disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox . . . over the same time period." FAC ¶ 10; *see also id.* ¶ 1. Taken together, these factual allegations—which are well-pled and must be accepted as true at this stage of the proceedings—more than adequately state a claim for relief under the PPPA.

The Privacy Policy attached to the FAC as Ex. G is a cached copy from the Wayback Machine from July 10, 2016, and it contains a "last revised" date of March 11, 2015. FAC ¶ 6 & *id.*, Ex. G. It states that Defendant has a practice of transmitting

"contact data, including email addresses, available in certain of our subscription-only databases" to third parties[9], and further states that Defendant "also may receive information about you from external sources that are not affiliated with [Defendant] and add that to the information you have provided to us. For example, we may expand our communities by acquiring names and contact details from other sources that compile contact information."[10] *Id.*, Ex. G. These admissions, squarely from within the relevant pre-July 31, 2016 time period, by themselves are sufficient to render the FAC's disclosure-related allegations plausible.

---

[9]    The term "subscription-only databases" is plainly a reference to the subscriber lists rented and exchanged by Defendant to third parties on the open market; Defendant has merely labeled the subscriber database as a "subscription-only database," with the renter or exchanger being the "subscr[iber]."

[10]    Defendant claims that this statement reflects only the "recei[pt]" of information from other third parties about Defendant's subscribers. *See* Mot. at 16, PageID.1174. However, the FAC alleges, and Plaintiff and his counsel know from significant experience litigating these cases, that the above is not the way it works in the data brokerage business. As the FAC alleges, Defendant transmitted its entire customer database to data appenders and aggregators in order for those entities to "enhance" Defendant's data by appending to it additional demographic and personal information about each of its customers, which Defendant could then rent and exchange to other third parties for more money and on more favorable terms. *See* FAC ¶¶ 13, 50, 69; *see also id.* ¶ 6 & *id.*, Ex. E. And that makes sense, because the data appenders and data aggregators could not possibly have known who Defendant's customers were (for purposes of appending more data about each of them to Defendant's customer database) unless Defendant transmitted to them its customer database that identified each of those customers.

The recent decision in *Nashel*, heavily relied upon by Defendant in the Motion, is readily distinguishable and, in any event, an outlier that was wrongly decided. The plaintiffs in *Nashel* pointed to data cards "published online in 2007 and 2008" to support their allegations that the Defendant disclosed its subscribers' eight years <u>later</u> during the applicable limitation period—and the court in *Nashel* seized on this "timing issue" in its order granting defendant's motion to dismiss. *See Nashel*, 2022 WL 6775657, at *1, 5. In this case, on the other hand, there is no such "timing issue" because the FAC: (1) attaches a copy of the "US Agriculture Masterfile (formerly Agbase) from Informa Mailing List" offered for sale in 2022 (with "counts through 05/19/2021"), <u>post-dating the relevant pre-July 31, 2016 time period</u>, FAC ¶ 2 & *id.*, Ex. A; (2) attaches exhibits of several press-releases and news articles from prior to and during the relevant pre-July 31, 2016 time period, which make clear that Defendant was engaged in the wholesale disclosure of its subscriber database to third party marketers throughout the relevant pre-July 31, 2016 time period, *see* FAC ¶¶ 4-7 & *id.*, Exs. C-F; and attaches a cached copy of Defendant's own Privacy Policy (last updated in 2015) as it existed on July 10, 2016, squarely in the middle of the relevant pre-July 31, 2016 time period in which Defendant admits to engaging in the disclosure practices alleged in the FAC.[11] FAC ¶ 8 & *id.*, Ex. G

---

[11]    The Wayback Machine Internet Archive (archive.org) has cached copies of webpages on sites across the Internet from various dates on which its "crawlers" were active and were collecting data. *See* "Internet Archive: Web archiving,"

These allegations collectively show that Defendant's practices of systematically disclosing all of its customers' Private Reading Information and other data (to third party data appenders, aggregators, renters, and others) began at least as far back as 2015 and persisted "THROUGH 05/19/2021," and thus were ongoing during the relevant pre-July 31, 2016 time period. FAC ¶¶ 2, 6, 13, 49-53, 68-80 & *id.*, Exs. A-

---

Wikipedia, available at: https://en.wikipedia.org/wiki/Internet_Archive#Web_archiving (last accessed Nov. 30, 2022) ("The service can be used to see what previous versions of web sites used to look like, to grab original source code from web sites that may no longer be directly available, or to visit web sites that no longer even exist. Not all web sites are available because many web site owners choose to exclude their sites. As with all sites based on data from web crawlers, the Internet Archive misses large areas of the web for a variety of other reasons."). Thus, the fact that cached copies of Defendant's data card are not available from the relevant pre-July 31, 2016 time period in no way indicates that the data card was not publicly accessible on Nextmark's website during the relevant pre-July 31, 2016 time period. As the FAC alleges, the disclosure practices in which Defendant was engaged prior to the relevant pre-July 31, 2016 time period, as evidenced by the data card and privacy policy cited in the FAC in paragraphs 2 and 8 and depicted in Exs. A and G thereto, persisted unabated up through at least May 19, 2021, including for the duration of the relevant pre-July 31, 2016 time period. *See* FAC ¶ 2 (alleging that "[t]he same or a substantially similar 'data card' as the one shown above, with the same or similar rates and advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by Informa as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period – thus demonstrating that Informa was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period.") & *id.* ¶ 13 (alleging that Defendant "continuously engaged in these same practices (disclosing its entire database of its customers' Personal Reading Information to third parties, at least as frequently as once a month) since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period").

E.[12] Therefore, unlike in *Nashel*, where the plaintiff's allegations of 2015-16 disclosures were unsupported by a data card that post-dated that timeframe, here Plaintiff *has* attached as an exhibit a data card that post-dates the relevant pre-July 31, 2016 timeframe and *has* pled numerous additional facts establishing (and at the very least plausibly suggesting) that Defendant was actively and continuously disclosing Plaintiff's and Class members' (and all of its other customers') Private Reading Information to third parties on a monthly basis between 2015 and 2021 – a period of time which encompasses the entire relevant pre-July 31, 2016 time period.

Indeed, unconstrained by the timing issue related to the data cards identified in *Nashel*, the allegations of the FAC easily state a claim for violation of the PPPA. Again, the FAC specifically alleges that Defendant disclosed its entire subscriber database, including Plaintiff's and all other Michigan customers' Private Reading Information, to data aggregators and appenders and numerous other third parties, on at least as frequently as a monthly basis, during the relevant pre-July 31, 2016 time

---

[12] Put another way, the screenshot of Defendant's data card on Nextmark's website in Ex. A to the FAC establishes that Defendant's mailing list continued to be available online <u>after</u> the relevant pre-July 31, 2016 time period, whereas the screenshots in *Nashel* from 2007 and 2008 showed only that the New York Times mailing lists were available <u>before</u> the relevant pre-July 31, 2016 time period. Data sets comprise information gathered in the past. That is, a 2021 data set concerns actions taken in or prior to 2021—evidenced by the language of the mailing list itself ("COUNTS THROUGH") and as corroborated by numerous factual allegations of the FAC and the exhibits thereto (*see, e.g.*, FAC ¶¶ 1-2, 6, 13, 49-53, 68-80 & *id.*, Exs. A-G). The same may not be said of the 2007 and 2008 *Nashel* data cards screenshots, all of <u>which pre-dated</u> the relevant pre-July 31, 2016 time period.

period. And because the relevant pre-July 31, 2016 time period in this case (even without the benefit of tolling from the pendency of the *DelValle* action) is greater than a month (specifically, from June 11, 2016 through July 30, 2016), it may reasonably be inferred that Defendant disclosed its subscriber database (comprised of Plaintiff's and all Class members', and all of its other customers', Private Reading Information) at one of those monthly (or more frequent) intervals during that timeframe.

Further, *Nashel* is an outlier in PPPA jurisprudence and Plaintiff firmly believes it was wrongly decided. The decision applied a pleading standard far more stringent than Rule 8 imposes,[13] and required specificity that no PPPA plaintiff could ever satisfy. Every other court that presided over similar PPPA actions against publishers of written materials, arising from substantially the same allegations as

---

[13]    For one, *Nashel* improperly analyzed the plausibility of *the complaint's allegations*. *See Nashel*, 2022 WL 6775657, at *5 (stating that "the data cards make the complaint's allegations merely *possible* rather than plausible"). This was a plain error. On a motion to dismiss pursuant to Rule 12(b)(6), the question is not whether the complaint's allegations are plausible. Instead, the complaint's allegations must be accepted as true, and the question is whether those allegations, viewed together and with all reasonable inferences drawn in the plaintiff's favor, are plausibly suggestive of a claim for relief. *See, e.g.*, *Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). *Nashel* also recast allegations that were plainly factual in nature (such as, e.g., allegations that defendant systematically disclosed subscriber lists containing the plaintiff's Private Reading Information to specific third parties over a specific period of time) as "legal conclusions" merely because that underlying conduct happened to give rise to a PPPA claim. *See Nashel*, 2022 WL 6775657, at *5.

25

those made by Plaintiff here, has held that these allegations adequately stated a claim under the PPPA—including, most recently, in a well-reasoned, published decision from the Hon. Gordon J. Quist of the Western District of Michigan in *Horton*. *See Horton*, 380 F. Supp. 3d at 682 ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility"); *see also Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 685 (E.D. Mich. 2013) (Rosen, J.).

Defendant cites a non-binding, unpublished decision in *Wheaton v. Apple Inc.*, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019), but it too is readily distinguishable. For one, the FAC here contains many factual allegations concerning disclosures (made by a publisher—pursuant to standard, industry-wide practices—not by a technology company like Apple) that were not alleged in *Wheaton*. *See* FAC ¶ 36. Moreover, in *Wheaton*, the plaintiffs alleged PPPA violations arising from alleged disclosures of music stored on their phones and relied on NextMark data cards advertising the sale of this *sort* of data to bolster those allegations. *Wheaton*, 2019 WL 5536214 at *4. However, the defendant argued that it was not plausible to infer that Apple was even responsible for disclosing the data offered for sale on the data cards (neither directly nor indirectly) because that information (the existence of

music files on a phone), is *unlike* the Private Reading Information at issue in a case against a publisher such as here (which is comprised of records concerning a purchase of a magazine subscription to one of Defendant's publications); the defendant in *Wheaton*, in its motion to dismiss briefing, focused on this distinction, explaining that the information there was "not information that would uniquely come from the defendant (as actual lists of the names of who subscribes to a magazine plus their delivery addresses would likely come from the magazine publisher)." *See Wheaton*, Case No. 19-cv-02883 (N.D. Cal. Sept. 20, 2019) (def.'s reply in support of mot. to dismiss) (attached as **Exhibit D** hereto). Here, on the other hand, Defendant does not deny the reasonableness of inferring that the rental, sale, or exchange of records reflecting customers' purchases of subscriptions to *Michigan Farmer* from Defendant would necessarily have originated from Defendant (either directly or indirectly through intermediaries), including during the relevant pre-July 31, 2016 time period.

Defendant argues that the version of the Nextmark data card that appears as Ex. A to the FAC does not support Plaintiff's claim because it references subscriber information from 2021, not from the pre-July 31, 2016 time period. Mot. at 13-14, PageID.1171-72. Defendant is mistaken regarding the import of the information on the data card. Contrary to its assertion, the data card is *cumulative*, displaying "COUNTS THROUGH 05/19/2021." FAC ¶ 2. The current data card, at the very

least, plausibly suggests that Defendant sold Plaintiff's and Class members' Private Reading Information to third parties during the relevant pre-July 31, 2016 time period because the FAC alleges, and the Court must accept as true for purposes of deciding the Motion, that the data advertised in the data card attached to the FAC as Ex. A was also advertised on a substantially similar data card that existed during the relevant pre-July 31, 2016 time period, *see* FAC ¶ 2, and that, from at least as early as 2015 and as recently as 2021, Defendant "continuously" transmitted its customers' Private Reading Information to third party data appenders and aggregators (at least once a month) in order to have it enhanced with additional demographic and personal data about each subscriber, which Defendant then made available for rental and exchange – and in fact rented and exchanged it – to numerous other third parties who were interested in purchasing it over the same time period. FAC ¶¶ 1-2, 6, 13, 49-53, 68-80; *see also id.*, Ex. E. All of these allegations are further bolstered by Defendant's own privacy policy in effect *during* the relevant pre-July 31, 2016 time period, in which Defendant admitted to disclosing its customers' Private Reading Information to third parties, precisely as alleged in the FAC. *See* FAC ¶ 8 (citing *id.*, Ex. G (stating that "[w]e also may receive information about you from external sources that are not affiliated with Penton and add that to the information you have provided to us. For example, we may expand our communities by acquiring names and contact details from other sources that compile

contact information"; and admitting to disclosing "contact data, including email addresses, available in certain of our subscription-only databases" to third parties)). Defendant glosses over these factual allegations and the accompanying exhibits in an ill-guided effort to liken this case to *Nashel*.

And while Defendant questions the source of the information in the data card (Mot. at 14, PageID.1172 ("The data card does not identify from where the information is or would be obtained . . .")), the data card itself is titled "US Agriculture Masterfile (formerly Agbase) **from Informa** Mailing List[,]" *see* FAC ¶ 2 & *id.*, Ex. A (emphasis added), which more than plausibly establishes that the offered data originated from Defendant. Basic common sense also confirms that Defendant is the only original source of the list containing the names and addresses of its subscribers. *See Horton*, 380 F. Supp. 3d at 682. As the FAC alleges, Nextmark is a list broker which advertises on its website the data cards of various publishers, including Defendant, in order to broker sales of the advertised data on behalf of its clients. Thus, Nextmark brokers sales of Defendant's subscribers' Private Reading Information to third parties on behalf of Defendant. The Nextmark data card is just one example of many types of disclosures made by Defendant during the relevant time period. But the existence of the data card, together with the admissions in Defendant's privacy policy and the other factual allegations of the FAC, confirm the systematic nature of Defendant's disclosures practices.

Defendant attempts to sweep the allegations, articles, and press releases concerning Defendant's "SmartReach" service (*see* FAC 4-7 & *id.*, Exs. C-G) under the rug by arguing that "the SmartReach division was a marketing division within Penton Media (Defendant's predecessor) that provided business-to-business marketing services to its clients from its vast database of 'business records,'" and that "[t]he articles say nothing about whether the SmartReach division disclosed ***consumer*** subscriber information[.]" Mot. at 15, PageID.1173 (citing FAC, Exs. C-D) (emphasis in Mot.). The problem with this argument is two-fold: (1) businesses are comprised of business owners and business employees, all of whom are consumers, and (2) business owners and employees are the people who purchase subscriptions to Defendant's publications. For example, Class members who are small business owners (who own their own farm) may purchase their *Michigan Farmer* magazine subscription in their own name. But because such Class members own a farm, Defendant would consider the record of these Class members' purchase of their *Michigan Farmer* subscription to be a "business record." Indeed, even Defendant's data card states that it contains the Private Reading Information of "**individuals** who subscribe to one or more of the following Penton titles: . . . Michigan Farmer[.]" FAC, Ex. A (emphasis added). Moreover, Defendant's own press release announcing the release of its SmartReach division boasts that "[t]he database has 16 million business-to-business records, representing 7.8 million

unique businesses" (FAC ¶ 4 & *id.*, Ex. C) – thus confirming that when Defendant refers to "business records" it is actually referring to records pertaining to individual subscribers, many of whom may be affiliated with the same business. At the end of the day, however, whether Defendant considers Plaintiff's Private Reading Information a "business" record makes no difference for purposes of its liability under the PPPA, because it disclosed his Private Reading Information to third parties without his consent just the same.

Defendant says that "the articles [attached to the FAC] do not state that any subscriber information would be disclosed to third-parties; instead, they specifically state that [Defendant] would be keeping all data in-house[.]" Mot. at 16, PageID.1174. This too is incorrect. Ex. D to the FAC clearly states that Defendant's SmartReach service was "[f]ocused on developing, managing and **delivering targeted data and subscriber info to marketers**[.]" FAC, Ex. D (emphasis added). The same exhibit states that, in connection with the launch of SmartReach, Defendant "added 11 new staff members, including seasoned data pros Karl Renelt, director of online media, and **Rosalie Garcia, strategic list sales manager**, in order to provide the more sophisticated data analysis and targeted applications needed for the more sophisticated marketing services being offered within the vertical markets, as well as cross markets." *Id.* (emphasis added). Moreover, contrary to Defendant's misleading interpretation of Ex. C to the FAC, this press release clearly shows that,

with SmartReach, Defendant would no longer be outsourcing its subscriber list rentals and exchanges to "list vendors," but rather would be renting and exchanging its subscriber lists to third parties all on its own. *See* FAC, Ex. C (stating that "[t]his division capitalizes on [Defendant]'s strengths -- data, user engagement and targeted marketing -- **by managing its data in-house instead of outsourcing its subscriber and data information to list vendors as it had done previously**.") (emphasis added). Defendant's own employee is quoted in the press release as admitting that SmartReach will "expand our ability to help . . . direct marketers **utilize our highly engaged [subscriber] file.**" *Id.* (emphasis added). Thus, Defendant's statement that it would be "managing its data in-house" upon the launch of SmartReach, rather than through "list vendors" as it had done up to that point, simply meant that Defendant would be renting and exchanging its customer data on its own rather than through intermediaries – in order to keep more of the profit for itself.

Notably, Defendant does not deny publicly advertising a data card offering to rent and exchange all of its subscribers' Private Reading Information to third parties during the relevant pre-July 31, 2016 time period. Nor does Defendant even deny disclosing Plaintiff's and Class members' Private Reading Information to data appenders and aggregators and all of the various other types of third parties specified in the FAC during the relevant time period. Defendant's attack on the sufficiency of the FAC's allegations is thus an attempt to evade liability under a statute that

Defendant itself knows it violated, on the grounds that Plaintiff's allegations do not conclusively prove a violation with hard evidence.[14] That is not the standard that Rule 8 imposes. After accepting the FAC's allegations as true and drawing all reasonable inferences from them in Plaintiff's favor, it would be reversible error to dismiss this case pursuant to Rule 12(b)(6) given Rule 8's low bar.

What Defendant really wants to do is turn the PPPA into a toothless tiger. The crux of this lawsuit is that Defendant *failed to inform* Plaintiff and the proposed Class members that it would disclose their Private Reading Information to others and *failed to obtain their consent* prior to disclosing that information to others. Plaintiff and the

---

[14] In this regard, Defendant faults Plaintiff for attaching to the FAC an "unauthenticated" data card, Mot. at 13, PageID.1171, and articles that contain "unauthenticated hearsay," *id.* at 15, PageID.1173. But this case is not at trial, or even summary judgment. It is at the pleadings stage. There is nothing improper about attaching exhibits to a complaint without "authenticating" them or relying on "hearsay" in support of factual allegations – at this stage of the litigation, the Court must consider all of these materials to be factual allegations, accept those allegations and all other factual allegations in the FAC as true, and determine whether they, together with all inferences drawn from them, in the light most favorable to Plaintiff, plausibly suggest an entitlement to relief. *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. Zovko*, 2016 WL 9778195, at *3 (N.D. Ohio July 8, 2016) ("Defendants complain that the allegations in and documents attached to the Second Amended Complaint were not made with firsthand knowledge, and are uncorroborated, unauthenticated and circumstantial. . . . Although unclear, Defendants seem to be arguing that, because the Second Amended Complaint is not based on admissible evidence, Plaintiff has failed to meet the Rule 9 particularity standard. If this is their argument, it is unsound. The claims in Plaintiff's Second Amended Complaint based on fraud and the facts and documents in support of those claims are *allegations*, not evidence. The admissibility of those facts are addressed at an entirely different stage of litigation.").

Class members cannot possibly be expected to allege the exact dates of each disclosure or all of the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery. By demanding such specificity, Defendant asks the Court to adopt a pleading standard no PPPA plaintiff could ever satisfy, emasculating this important consumer protection statute and absolving Defendant of its liability under it in the process. This Court need not go along. The FAC states a claim, and the Motion should be denied.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.[15]

Dated: February 7, 2023                          Respectfully submitted,

                                                 */s/ E. Powell Miller*
                                                 E. Powell Miller (P39487)
                                                 Sharon S. Almonrode (P33938)
                                                 THE MILLER LAW FIRM, P.C.
                                                 950 W. University Drive, Suite 300
                                                 Rochester, MI 48307
                                                 Tel: 248-841-2200
                                                 epm@millerlawpc.com
                                                 ssa@millerlawpc.com

---

[15]     Defendant argues that any dismissal in this action should be with prejudice. But "[R]ule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). If any part of the FAC is dismissed, Plaintiff respectfully requests leave to amend to afford him an opportunity to cure any deficiencies in the FAC identified by the Court.

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

*Counsel for Plaintiff and the Putative Class*

## <u>CERTIFICATE REGARDING WORD COUNT</u>

Plaintiff, in compliance with L.R. 7.2(b)(i)-(ii), used 9,332 words in Plaintiff's foregoing brief. Microsoft Word for Office 365 Business version 1910 is the word processing software used to generate the word count in the attached brief.

Dated: February 7, 2023            Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

*Counsel for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2023, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com