UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK GOTTSLEBEN,

    Plaintiff,

v.

INFORMA MEDIA, INC.,

    Defendant.

_____/

Case No. 1:22-cv-866

Hon. Hala Y. Jarbou

## **OPINION**

This is a putative class action asserting violations of Michigan's Preservation of Personal Privacy Act (PPPA), Mich. Comp. Laws § 445.1711 et seq. (1989). Before the Court is Defendant's Rule 12(b)(6) motion to dismiss the amended complaint. For the reasons herein, the Court will deny the motion.

### I. BACKGROUND

According to the amended complaint, Defendant Informa Media, Inc., formerly known as Penton Media, Inc., has owned and operated the *Michigan Farmer* magazine since November 2012. Plaintiff Mark Gottsleben is a Michigan resident who subscribed to this magazine before July 31, 2016. (Am. Compl. ¶ 17, ECF No. 16.) Gottsleben alleges that Informa later disclosed his "Private Reading Information" to third parties, in violation of the PPPA. (*Id.* ¶ 13.) In other words, sometime before July 31, 2016, Informa allegedly disclosed his name, address, and the fact that he subscribed to *Michigan Farmer*. (*Id.* ¶ 17.) Gottsleben alleges that, following Informa's disclosures, he received a "barrage of unwanted junk mail." (*Id.* ¶ 1.)

Until the PPPA was amended in July 2016, it prohibited "a person . . . engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings,

or video recordings" from "disclos[ing] to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer." Mich. Comp. Laws § 445.1712 (1989). That version of the PPPA also entitled the customer to recover the following for a violation of the statute: "[a]ctual damages, . . . damages for emotional distress, or $5,000.00, whichever is greater," as well as "[c]osts and reasonable attorney fees." Mich. Comp. Laws § 445.1715 (1989). The amended version of the PPPA in effect today no longer allows for $5,000 in statutory damages; it requires plaintiffs to prove the amount of their actual damages. *See* Mich. Comp. Laws § 445.1715 (2016).

Gottsleben's claim relies on the earlier version of the PPPA. He alleges that Informa disclosed his information "during the relevant pre-July 31, 2016 time period," when that version was still in effect. (Am. Compl. ¶ 11.) In support of his claim, Gottsleben's complaint provides a screenshot of a "data card" marketed by a "list broker," NextMark, LLC. (*Id.* ¶ 2.) NextMark's data card advertised the sale of information from an "Informa Mailing List," "with counts through 05/19/2021." (*Id.*) Gottsleben also alleges that a "substantially similar" data card with the "same or similar rates" was advertised online "as far back as the beginning of 2015 and throughout the entire relevant pre-July 31, 2016, time period[.]" (*Id.*)

Gottsleben further alleges that Informa announced in 2014 that it had formed a division focused on the "delivery of targeted data and subscriber information to help direct marketers identify, reach and activate more prospects and generate more effective leads." (*Id.* ¶ 4.) In other words, Informa intended to package and sell its subscriber information directly to third parties instead of relying on list brokers like NextMark. (*See id.* ¶ 5; 3/26/2014 News Release, ECF No. 16-4, PageID.618 ("This division capitalizes on [Informa's] strengths -- data, user engagement and targeted marketing -- by managing its data in-house instead of outsourcing its subscriber and

2

data information to list vendors as it had done previously.").) Informa subsequently launched its data services in 2015. (*Id.* ¶ 6.) Indeed, as of March 2015, Informa's privacy policy on its website stated that it made "contact data" about its customers available to "suppliers in [its] communities" through "subscription-only databases." (Informa Privacy Policy, ECF No. 16-8, PageID.638.)

Gottsleben seeks statutory damages of $5,000 for each violation of the PPPA, and he intends to represent a class of other Michigan residents whose subscription information Informa disclosed to other parties prior to July 31, 2016.

Informa moves to dismiss the amended complaint, arguing that it is untimely and fails to state a claim.

## II. LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff to make a "short and plain statement of the claim showing that the pleader is entitled to relief." The statement must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "[t]he plausibility standard . . . is not akin to a probability requirement . . . it asks for more than a sheer possibility" that the alleged misconduct occurred. *Id*. "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013). "[A] statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008).

When considering a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). The Court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678,

3

or "formulaic recitations of the elements of a cause of action," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Court is generally bound to consider only the complaint when resolving a motion to dismiss, though the Court may also consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. ANALYSIS

#### A. Subject Matter Jurisdiction

Before addressing merits of Informa's motion, the Court will discuss its subject matter jurisdiction. For a putative class action like this one, the diversity jurisdiction statute requires that "any member of a class of plaintiffs is a citizen of a State different from any defendant[.]" 28 U.S.C. § 1332(d)(2)(A). Here, Gottsleben alleges that he is a resident and citizen of Michigan. He also alleges that Informa is a citizen of Delaware, where it is incorporated, and of New York, where it has its principal place of business. (Am. Compl. ¶ 18.) Thus, the citizenship requirement has been met.

For class actions, the diversity jurisdiction statute also requires that the amount in controversy exceed "$5,000,000, exclusive of interest and costs[.]" 28 U.S.C. § 1332(d)(2). Gottsleben alleges that the potential class has "thousands" of members, each of which would be entitled to at least $5,000 in statutory damages. (Am. Compl. ¶ 58.) With more than a thousand class members entitled to $5,000 each, the amount in controversy exceeds $5,000,000. Therefore, the Court is satisfied that it has subject matter jurisdiction over this case.

**B. Timeliness of the Action**

Informa argues that Gottsleben's claim is untimely. It argues that he filed this case after the expiration of the six-year statute of limitations in Mich. Comp. Laws § 600.5813. Because Gottsleben asserts a claim under the previous version of the PPPA, his claim must have accrued no later than July 30, 2016, the day before amendment of that statute. He filed his original complaint in this action on September 19, 2022, more than six years after July 2016.

However, the Michigan Supreme Court issued administrative orders tolling all Michigan statutes of limitations for 102 days during the COVID-19 pandemic in 2020. *See Carter v. DTN Mgmt. Co.*, No. 360772, 2023 WL 439760, at *3 & n.2 (Mich. Ct. App. Jan. 26, 2023) (discussing the Michigan Supreme Court's tolling orders and noting that they excluded the counting of days starting on March 10, 2020, until June 20, 2020).[1] Specifically, Administrative Order (AO) 2020-3 provided that, "[f]or all deadlines applicable to the commencement of all civil and probate case types," "any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included for purposes of MCR 1.108(1)." *Id.* at *1 (quoting AO 2020-3). Michigan's governor had declared a state of emergency on March 10, 2020, so AO 2020-3 stopped the counting of time as of March 10, 2020. *Id.*

Several months later, the Michigan Supreme Court issued AO 2020-18, which resumes the counting of days effective June 20, 2020, and provides that "filers shall have the same number of days to submit their filings on June 20, 2020, as they had when the exclusion went into effect on March 23, 2020." *Id.* at *2 (quoting AO 2020-18). After accounting for tolling, the limitations period for Gottsleben's claim expired, at the latest, on November 8, 2022, which is six years and

---

[1] As several courts have done, Gottsleben calculates the number of days tolled as 101. The Court accepts that calculation for purposes of this Opinion. However, the Court notes that June 20, 2020, is 102 days after March 10, 2020. *See Compagner v. Burch*, No. 359699, 2023 WL 3766734, at *3 (Mich. Ct. App. June 1, 2023) (describing the tolling period as a 102-day period).

101 days after July 30, 2016.  Gottsleben filed this action in September 2022, before the limitations period expired.

Informa responds that the Michigan Supreme Court's orders do not apply here.  It argues that the orders only apply to deadlines that fell between March 10, 2020, and June 19, 2020.  Because Gottsleben's deadline expired long after June 10, 2020, Informa argues that he cannot rely on those orders.

The Michigan Court of Appeals considered and rejected Informa's argument in *Carter*.  As noted by that court, "the Supreme Court did not exclude [from the computation of time] only deadlines that fell during the state of emergency.  Rather, it more broadly excluded *any day* within the state of emergency 'for purposes of determining the deadline applicable to the commencement of all civil and probate case types under MCR 1.108(1).'"  *Carter*, 2023 WL 439760, at *3 (quoting AO 2020-18).  For those filers like Gottsleben, "whose filing periods began to run before . . . March 23, 2020," "[t]here is no language in AO-2020-18 limiting [it] to those whose filing deadline fell within the state of emergency."  *Id.*  That court's reasoning is persuasive.  And as a published decision, it is binding on this Court.  *See Griffin v. Reznick*, 609 F. Supp. 2d 695, 703 (W.D. Mich. 2008) ("A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts.").

Informa argues that this Court should not follow *Carter* because that court relied solely on the language of Administrative Order 2020-18, which restarted the computation of time but did not modify the language of the AO 2020-3 with respect to the tolling of a "deadline." As discussed in *Carter*, however, AO 2020-3 excluded the computation of "days" for "all deadlines," not just those deadlines that fell within a particular time period.  *See Carter*, 2023 WL 439760, at *3 (discussing AO 2020-3).

6

Informa also argues that the tolling period does not apply because Gottsleben faced no COVID-19-related hurdles that prevented him from commencing his action. However, the Michigan Supreme Court's orders contain no such limitation. They apply to all deadlines for all filers, not just deadlines for filers who experienced COVID-19-related hurdles. Indeed, the tolling orders were not motivated solely by potential hurdles to filing. "[T]he Court was also clearly concerned with limiting in-person interactions and protecting court staff and the public from COVID-19." *Id.* at *4. By excluding certain days from the computation of time under the statutes of limitations, the Michigan Supreme Court "undoubtedly lessened the amount of in-person interactions at courts during the early stages of the pandemic." *Id.*

Next, Informa contends that, even if the Michigan Supreme Court's orders extended the time for filing a claim, those orders did not extend the time for Gottsleben to pursue a cause of action for statutory damages. To the contrary, Gottsleben's right to relief under the prior version of the PPPA stems from the right to file a claim. Informa provides no basis for separating these rights from one another. Thus, if Gottsleben filed a timely claim under the prior version of the PPPA, then statutory damages are available to him under that version of the statute.

Informa also suggests that the Michigan Supreme Court lacked authority to issue orders that purported to modify statutes of limitations. However, the court in *Carter* examined this issue and disagreed. *See Carter*, 2023 WL 439760, at *4. That reasoning is persuasive.

Finally, Informa argues that the Court should not apply the Michigan Supreme Court's administrative orders because those orders are "procedural" in nature. Generally, "federal courts are to apply state substantive law and federal procedural law." *Hanna v. Plumber*, 380 U.S. 460, 465 (1965); *see Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural

7

law."). Informa contends that the Court must apply federal procedural rules instead of the Michigan Supreme Court's orders, but there is no federal procedural rule that would apply. The Court is simply giving effect to the Michigan Supreme Court's decision to toll its statutes of limitations and other deadlines for a period of time. That decision does not conflict with any federal rules. Where, as here, "there [is] no Federal Rule which cover[s] the point in dispute, *Erie* command[s] the enforcement of state law." *Hanna*, 380 U.S. at 470. To do otherwise would result in an "'inequitable administration' of the law" whereby Informa could escape from liability "solely because of the fortuity that there is diversity of citizenship between the litigants." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 753 (1980) (quoting *Hanna*, 380 U.S. at 468). Accordingly, the Court will enforce the Michigan Supreme Court's orders.

### C. Failure to State a Claim

Next, Informa argues that Gottsleben has failed to plead sufficient factual allegations, taken as true, to state a claim. Generally, to plead a viable claim under the prior version of the PPPA, Gottsleben must allege (1) that Informa possessed a "record or information" concerning Gottsleben's purchase of reading materials from Informa, and (2) that Informa disclosed this information to a third party before July 30, 2016, without his consent. *See* Mich. Comp. Laws §§ 445.1712, 445.1713 (1989). There is an exception to the consent requirement where "the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer" and the disclosing party "inform[s] the customer by written notice that the customer may remove his or her name at any time[.]" *Id.* § 445.1713.

#### 1. Timing of Disclosures

First, Informa argues that Gottsleben fails to provide sufficient factual allegations to support a plausible inference that Informa disclosed his information when he claims it did. In his amended complaint, Gottsleben alleges that Informa disclosed his information "during the pre-

8

July 31, 2016 time period[.]" (Am. Compl. ¶ 1.) Similarly, he alleges that he subscribed to *Michigan Farmer* "prior to July 31, 2016." (*Id.* ¶ 17.) As to timing, these allegations are fairly vague. Elsewhere, however, he clarifies that he is referring to a time period from April 15, 2016, to July 30, 2016. (*Id.* ¶ 1 n.1.)

The most detailed factual support for Gottsleben's assertion that Informa violated the PPPA is an image of NextMark's data card from 2021, five years *after* the relevant time period. The image states that NextMark's database is "current" through May 19, 2021, but it does not expressly indicate that NextMark advertised the sale of any information from 2016. Thus, Gottsleben's allegations require the Court to infer that, because NextMark offered its information for sale in 2021, Informa disclosed it to a third party sometime during the three-month period from April to July 2016. Without more, the half-decade time gap between NextMark's data card and the alleged violation makes Gottsleben's claim somewhat tenuous.

A similar concern arose in *Nashel v. N.Y. Times Co.*, No. 2:22-cv-10633, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022). There, the plaintiff alleged PPPA violations by the defendant in 2016 based, in part, on the existence of two NextMark data cards, one from 2007 and one from 2008. *See id.* at *1. The plaintiff also relied on the defendant's privacy policy from 2015 and a research study from 2020. The research study implicated the defendant in a marketing strategy that included the disclosure of email lists. Despite these facts, the court concluded that the allegations were not sufficient to state a claim. In particular, reliance on the data cards was problematic because they predated the relevant time period by eight and nine years, respectively. *Id.* at *5. Here, NextMark's data card postdates the relevant time period by five years.

In contrast to the complaint in *Nashel*, there are additional facts alleged here to support a plausible inference that Informa disclosed Gottsleben's subscriber information during the relevant

9

time period. Those facts include his allegations that Informa advertised a substantially similar data card in early 2015. (Am. Compl. ¶ 2.) In addition, in 2014, Informa issued news releases touting its development and marketing of a database of customer information. (*Id.* ¶¶ 4-6.) Also, its privacy policy from 2015 indicated that it was disclosing customer information to third parties. Together, these allegations are sufficient to infer disclosures of Gottsleben's information by Informa in 2016.

### 2. Type of Information Disclosed

Informa argues that Gottsleben faces another problem. It argues that Gottsleben has not sufficiently alleged that the *type* of information purportedly disclosed by Informa was protected by the PPPA.

The prior version of the PPPA protected the "record or information concerning the purchase, lease, rental, or borrowing of *those materials* by a customer that indicates the identity of the customer." Mich. Comp. Laws § 445.1712 (1989) (emphasis added). By "those materials," the statute was referring to "books or other written materials, sound recordings, or video recordings." *Id.* The statute did not further define "information," but the statute's reference to "information concerning . . . *those materials*" indicates that the legislature intended to protect information about the particular books, recordings, or other materials selected by the customer. "Thus, in order to be liable under the PPPA, the defendant must have disclosed information identifying both the customer *and* the particular materials that the customer selected for purchase or rental." *Bozung v. Christianbook, LLC*, No. 1:22-cv-304, 2023 WL 2385004, at *6 (W.D. Mich. Mar. 6, 2023).

Here, NextMark's data card states that it offered a "mailing list." (*See* Am. Compl. ¶ 2.) Such a list presumably contains name and contact information. The data card also refers to separate lists associated with specific publications, including "The Progressive Farmer," "Farming

Magazine," and "Farm Show Magazine." (*Id.*) Thus, it is plausible to infer that NextMark's database contained information about the identity of Informa's customers and the particular publications to which those customers subscribed. And because this information likely would have originated from Informa, it is plausible to infer that Informa disclosed this information to NextMark or to another third party from whom NextMark obtained that information. *See Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018) ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility.").

Informa notes that its press releases from 2014 and 2015 and its privacy policy from 2015 do not expressly refer to disclosures of its customers' subscription information. However, Gottsleben alleges in his complaint that Informa disclosed that sort of information in 2016. The Court must accept that allegation as true. Moreover, both of the 2014 press releases refer to "subscriber" information and "targeted" data, which suggest that Informa marketed more than merely lists of its customers' names and contact information. (3/26/2014 Press Release, ECF No. 16-4, PageID.619; 4/8/2014 Press Release, ECF No. 16-5, PageID.623.) Also, considering the contents of NextMark's data card from 2021 and the alleged existence of a "substantially similar" data card in 2015, it is plausible to infer that Informa's purported disclosures in 2016 contained information about its customers' subscriptions.

In short, Informa's arguments are not persuasive. Gottsleben's allegations are sufficient to state a plausible claim.

## IV. CONCLUSION

For the reasons discussed above, Gottsleben's complaint is timely. Moreover, when construing the allegations in the complaint in the light most favorable to Gottsleben, he has pleaded

11

sufficient factual matter to support a plausible claim that Informa violated Gottsleben's rights under the PPPA before July 31, 2016. Accordingly, the Court will deny Informa's motion to dismiss the complaint.

An order will enter in accordance with this Opinion.

Dated: July 7, 2023                    /s/ Hala Y. Jarbou
                                                          HALA Y. JARBOU
                                                          CHIEF UNITED STATES DISTRICT JUDGE