## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARK GOTTSLEBEN, individually and on behalf of all others similarly situated, | CASE NO. 1:22-cv-00866-HYJ-RSK CLASS ACTION |
| Plaintiff, | Chief Judge Hala Y. Jarbou Magistrate Judge Ray Kent |
| vs. | |
| INFORMA MEDIA, INC. F/K/A PENTON MEDIA, INC., | **ANSWER AND AFFIRMATIVE DEFENSES** |
| Defendant. | |

Defendant Informa Media, Inc., by and through its attorneys, hereby answers the averments set forth in Plaintiff Mark Gottsleben's ("Plaintiff") First Amended Class Action Complaint and Demand for Jury Trial (Dkt. No. 16, the "Complaint"), as numbered herein, and asserts affirmative defenses as follows:

## ANSWER

1.      Defendant Informa Media, Inc. f/k/a Penton Media, Inc. ("Informa") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's *Michigan Farmer* magazine subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Plaintiff has received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading Information (defined below) during the relevant pre-July 31, 2016 time period[1], Informa violated

---

[1]      The statutory period for this action is six years, which is 2,190 days.  *See* M.C.L. § 600.5813.  The applicable six-year limitation period was tolled for 101 days pursuant to Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic.  *See* Mich. Executive Order No. 2020-58 ("[A]ll deadlines applicable to the commencement of all civil and probate actions and proceedings, including but not limited to any deadline for filing an initial

Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), id. § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

**ANSWER:**   Informa denies knowledge or information sufficient to form a belief as to whether it disclosed information about Plaintiff's magazine subscription to list brokers because the

---

pleading . . . are suspended as of March 10, 2020 and shall be tolled until the end of the declared states of disaster and emergency."); Mich. Supreme Court Administrative Order No. 2020-3 ("For all deadlines applicable to the commencement of all civil and probate case types, including but not limited to the deadline for the initial filing of a pleading . . . any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included."); Mich. Executive Order No. 2020-122 (ending tolling period on June 20, 2020); Mich. Supreme Court Administrative Order No. 2020-18 (same); *see also Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999) (under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation"); *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983) ("Pursuant to the Erie doctrine, state statutes of limitations must be applied by federal courts sitting in diversity.").

The applicable six-year limitation period was additionally tolled for 57 days, from June 21, 2022 through August 17, 2022, during the pendency of the action *DelValle v. Informa Media, Inc*., 1:22-cv-00132-HYJ-RSK (W.D. Mich.) (putative class action brought on behalf of the same putative class in this case, filed June 21 2022 and dismissed on August 17, 2022). *See Cowles v. Bank West*, 719 N.W.2d 94, 101 (Mich. 2006) (explaining that, under Michigan law, "[t]he statute of limitations is tolled as to all persons within the class described in the complaint on the commencement of an action asserting a class action." (citing M.C.R. § 3.501(F)(1)); *Boelter v. Hearst Commnc'ns Inc*., 269 F. Supp. 3d 172, 187-89 (S.D.N.Y. 2017) (holding that M.C.R. 3.501(F)(1) applies in federal court, and that the statute of limitations for the PPPA claims of putative class members is tolled by the filing of a putative class action); *see also Philips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006) ("[C]ourts thus disregard the jurisdictional void that is created when the named plaintiffs' claims are dismissed and, shortly afterwards, surrogates step forward to replace the named plaintiffs.").

Thus, the applicable statutory period for this action is April 15, 2016 (2,348 days prior to the commencement of the instant action on September 19, 2022) through July 30, 2016.

2      In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc 'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USIFilm Prods*., 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the preamendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

potential data no longer exists, and thus denies the allegations.  Informa also lacks knowledge or information sufficient to form a belief as to whether Plaintiff received a "barrage of junk mail", and thus denies the allegations.  Informa additionally denies that any purported junk mail was sent to Plaintiff because of Informa's alleged unauthorized disclosure of subscription information to third parties.  Informa denies all other factual allegations contained in this paragraph.  Information further states that the remaining allegations in this paragraph state legal conclusions to which no response is required.  To the extent a response is required, the allegations are all denied.

2.     Documented evidence confirms these facts.  For example, Informa, through list broker NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "US Agriculture Masterfile (formerly Agbase) from Informa Mailing List", which contains the Private Reading Information of all 2,216,763 of Informa's active and recently expired U.S. subscribers at a base price of "$150.00/M [per thousand]," (i.e., 15.0 cents apiece), as shown in the screenshot below:



*See* **Exhibit A** hereto. The same or a substantially similar "data card" as the one shown above, with the same or similar rates and advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by Informa as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period – thus demonstrating that Informa was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre- July 31, 2016 time period.

**ANSWER:** Informa cannot verify the authenticity of the screenshot in this paragraph as purporting to be what was available on a third-party website at any given time. Moreover, Informa denies that this third-party material demonstrates that Informa made any such information available to the public—it did not. Informer denies that this purported evidence demonstrates any improper disclosure of personal reading information at any time. Therefore, denied. As limited exception, Informa admits that a document which is alleged to be a Nextmark Data Card is annexed as Exhibit A to the Complaint.

3. Up until November 2012, *Michigan Farmer* magazine was owned and operated by Farm Progress, a division of Fairfax Media. In November 2012, Penton Media, Inc. ("Penton") purchased Farm Progress, including *Michigan Farmer* magazine, from Fairfax Media. *See* Farm Progress, "Penton Media Buys Farm Progress From Fairfax Media"(Nov. 13, 2012), available at https://www.farmprogress.com/issues/penton-media-buys-farm-progress-fairfax- media (last visited Dec. 26, 2022), a copy of which is attached hereto as **Exhibit B.**

**ANSWER:** Informa admits only that Penton Media, Inc. purchased Farm Progress, including Michigan Farmer, from Fairfax Media in 2012. Informa denies each and every other allegation including to the extent that it is based upon an annexed document, whose authenticity is disputed and which speaks for itself. Informa respectfully refers the court to that document for the complete and accurate contents and context thereof.

4. On March 26, 2014, Penton "announced that it has formed Penton SmartReach™, a division focusing exclusively on the development, management and delivery of targeted data and

subscriber information to help direct marketers identify, reach and activate more prospects and generate more effective leads.  The database has 16 million business-to-business records, representing 7.8 million unique businesses." PRNewswire, "Penton Launches 'Penton SmartReach' Division" (Mar. 26, 2014), available at https://www.prnewswire.com/news-releases/penton-launches-penton-smartreach-division-252433931.html (last visited Dec. 26, 2022), a copy of which is attached hereto as **Exhibit C**.  Simply put, Penton's SmartReach service was "[f]ocused on developing, managing and delivering targeted data and subscriber info to marketers[.]" Chief Marketer, "New Penton Database Offers Targeted B2B Data" (Apr. 8, 2014), available at https://www.chiefmarketer.com/new-penton-database-offers-targeted-b2b-data/ (last visited Dec. 26, 2022), a copy of which is attached hereto as **Exhibit D**.  In connection with the launch of SmartReach, Penton "added 11 new staff members, including seasoned data pros Karl Renelt, director of online media, and Rosalie Garcia, strategic list sales manager, in order to provide the more sophisticated data analysis and targeted applications needed for the more sophisticated marketing services being offered within the vertical markets, as well as cross markets." *Id.*

**ANSWER:**    Informa admits only that it (via its predecessor, Penton Media, Inc.) had a SmartReach division during the referenced period.  Informa denies each and every other allegation to the extent that it is based upon an annexed document, the contents of which are hearsay.  Informa respectfully refers the court to that document for the complete and accurate contents and context thereof. Except as specifically admitted, Informa denies each and every other allegation in this paragraph, including that the incomplete quotes from a third-party document have any bearing on the issues in this case.

5.    Indeed, the creation of the SmartReach division was motivated by a desire to stop using "list vendors" to sell, rent, and exchange its subscribers' Personal Reading Information, and to instead sell, rent, and exchange that data to third parties on its own.  As reported at the time, "[t]his division capitalizes on Penton's strengths -- data, user engagement and targeted marketing -- by managing its data in-house instead of outsourcing its subscriber and data information to list

vendors as it had done previously." **Ex. C** hereto. Warren N. Bimblick, Senior Vice President, Strategy and Business Development at Penton, explained that "[w]e view this shift as very timely and an opportunity to vastly expand our ability to help endemic and non-endemic direct marketers utilize our highly engaged [subscriber] file[.]" *Id*. And Joann Kropp, Vice President, Customer Data Solutions at Penton, "whose career, including more than five years at Penton, includes the successful development of enhanced business intelligence and customer prospecting/marketing products," elaborated further: "Penton's more nimble and strategic approach to direct marketing puts us closer to clients by offering industry expertise and integrated marketing solutions that create better engagement and deliver better click through rates that list vendor[]s can't provide." *Id*. Kropp further explained that "Penton has built an experienced in-house team focused on driving maximum value from its data assets, developing data products and marketing solutions, like day- parting, that are based on user habits and strategic marketing tools." *Id.*

   **ANSWER:** Informa denies the allegations in this paragraph, including as applied to the claims in this case, as well as Plaintiff's summary of the referenced documents.

   6. On December 10, 2015, Penton announced the launch of its SmartReach "Audience Extension" service, which at the time was described as "provid[ing] [Penton's clients] the ability to precisely target audiences through deep data sets that provide intelligence across more than 1,000 key firmographic and demographic differentiators. Marketers can hypertarget ad messages to reinforce branding and drive greater conversion for email and website campaigns through a best practices approach, so ads are displayed wherever a potential customer travels online." PRNewswire, "New Penton SmartReach™ Audience Extension Provides Expanded Reach For Business-To-Business Marketers" (Dec. 10, 2015), available at https://www.prnewswire.com/news-releases/new-penton-smartreach-audience- extension- provides-expanded-reach-for-business-to-business-marketers- 300191123.html (last visited Dec. 26, 2022), a copy of which is attached hereto as **Exhibit E**. Penton was able to provide these services by utilizing data appending and aggregation services provided by other companies, which

necessarily required Penton to transmit its entire database of all of its subscribers' Personal Reading Information to third party data companies for enhancement.

> **ANSWER:**     Informa admits only that on December 10, 2015, it launched its SmartReach "Audience Extension" service.  Except as specifically admitted, Informa denies each and every other allegation in this paragraph, including as applied to the claims in this case, as well as Plaintiff's summary of the referenced documents. Informa denies that Plaintiff's characterization of the Exhibit E is accurate and specifically denies that Penton used data appending and aggregation services provided by other companies and/or transmitted its entire database of all of its subscribers personal reading information to those third parties.

7.     Penton's SmartReach division, as well as its Audience Extension service, remained active from its creation in 2014 until at least as recently as its acquisition by Informa in September 2016.  "As of 2016, the database had grown to some 20 million records." Wikipedia, "Penton (company)", available at https://en.wikipedia.org/wiki/Penton_(company) (last visited Dec. 26, 2022), a copy of which is attached hereto as **Exhibit F**.  Thus, Penton's SmartReach division was actively selling, renting, exchanging, and otherwise disclosing its entire database of its subscribers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to numerous third parties throughout the relevant pre-July 31, 2016 time period.

> **ANSWER:**     Informa admits only that Penton had a division called SmartReach which existed in 2014 and through 2016.  Except as specifically admitted, Informa denies each and every other allegation in this paragraph and denies the accuracy and the authenticity of the content in Exhibit F.

8.     It is therefore unsurprising that, during the relevant pre-July 31, 2016 time period, Penton admitted in its Privacy Policy that it discloses the Personal Reading Information of all of its subscribers to its various publications, which included *Michigan Farmer* magazine, to data appenders, data aggregators, and other third parties.  *See* Penton, "Privacy Policy (last revised: March 11, 2015)", version in effect on July 10, 2016, available at https://web.archive.org/web/20160710161658/http://www.penton.com/privacy-policy/, a copy of which is attached hereto as

**Exhibit G** (admitting to transmitting the Personal Reading Information of its subscribers to, and receiving enhanced versions back from, data appenders and aggregators by stating that "[w]e also may receive information about you from external sources that are not affiliated with Penton and add that to the information you have provided to us.  For example, we may expand our communities by acquiring names and contact details from other sources that compile contact information"; and admitting to disclosing "contact data, including email addresses, available in certain of our subscription-only databases" to third parties).

> **ANSWER:**    Informa denies the allegations in this paragraph, including as applied to the claims in this case, as well as Plaintiff's summary of the referenced Privacy Policy and the documents. The annexed document speaks for itself.  Informa respectfully refers the court to that document for the complete and accurate contents and context thereof.

9.       In September 2016, Informa PLC acquired Penton Media, Inc., including *Michigan Farmer* magazine, and subsequently changed the name of Penton Media, Inc. to Informa Media, Inc. See Folio Magazine, "Informa Acquires Penton for $1.56 Billion" (Sept. 15, 2016), available at https://archive.foliomag.com/informa-acquires-penton-1-56-billion/ (last visited Dec. 26, 2022), a copy of which is attached hereto as **Exhibit H**; New York Department of State, Division of Corporations, Entity Name History for Informa Media, Inc. (last accessed Dec. 26, 2022), a copy of which is attached hereto as **Exhibit I**.  Thus, during the relevant pre-July 31, 2016 time period, *Michigan Farmer* magazine was operated by Penton Media, Inc., now known as Informa Media, Inc., the defendant in this case.

> **ANSWER:**    Informa admits only that it acquired Penton Media, Inc., including Michigan Farmer magazine, and subsequently changed the name of Penton Media, Inc. to Informa Media, Inc. Except as specifically admitted, Informa denies each and every other allegation in this paragraph and states that the annexed documents speaks for themselves.  Informa respectfully refers the court to that document for the complete and accurate contents and context thereof.

10.       As a result of Informa (at the time known as Penton, but hereinafter referred to by its current name "Informa") disclosing Plaintiff's Private Reading Information during the relevant

pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox following his purchase of a subscription to *Michigan Farmer* over the same time period

> **ANSWER:** Informa denies each and every allegation in this paragraph.

11. By renting, exchanging, or otherwise disclosing the Private Reading Information of all of its Michigan-based subscribers during the relevant pre-July 31, 2016 time period, Informa violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

> **ANSWER:** Informa denies each and every allegation in this paragraph, other than the quoted content of Subsection 2 of the PPPA, which speaks for itself.

12. Accordingly, Plaintiff brings this First Amended Class Action Complaint against Informa for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

> **ANSWER:** Informa admits only that Plaintiff commenced this lawsuit alleging violations of the PPPA, but denies any violations thereof. Informa denies each and every other allegation in this paragraph.

### NATURE OF THE ACTION

13. To supplement its revenues, Informa rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as job title, number of employees, livestock type, sales volume, and farm annual income—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers. Informa

continuously engaged in these same practices (disclosing its entire database of its customers' Personal Reading Information to third parties, at least as frequently as once a month) since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period.

**ANSWER:**   Informa denies each and every allegation in this paragraph.

14.    By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, Informa is able to disclose the information time and time again to countless third parties.

**ANSWER:**   Informa denies each and every allegation in this paragraph.

15.    Informa's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

**ANSWER:**   Informa denies each and every allegation in this paragraph.

16.    While Informa profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because Informa does not obtain its customers' written consent prior to disclosing their Private Reading Information.

**ANSWER:**   Informa denies each and every allegation in this paragraph.

<u>**PARTIES**</u>

17.    Plaintiff Mark Gottsleben is a natural person and citizen of the State of Michigan and resides in Fife Lake, Michigan.  Plaintiff was a subscriber to *Michigan Farmer* magazine, including prior to July 31, 2016.  *Michigan Farmer* magazine is published by Informa.  While residing in, a citizen of, and present in Michigan, Plaintiff purchased his subscription to *Michigan Farmer* magazine directly from Informa.  Prior to and at the time Plaintiff subscribed to *Michigan Farmer*, Informa did not notify Plaintiff that it discloses the Private Reading Information of its customers, and Plaintiff has never authorized Informa to do so.  Furthermore, Plaintiff was never provided any written notice that Informa rents, exchanges, or otherwise discloses its customers'

**PAGE 10**

Private Reading Information, or any means of opting out.  Since subscribing to *Michigan Farmer*, and during the relevant pre-July 31, 2016 time period, Informa disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files.  Moreover, during that same period, Informa rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact Informa subscribers, without first obtaining the requisite written consent from Plaintiff or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

 **ANSWER:** Informa admits only that Mark Gottsleben is a natural person and resident of Michigan; that he was a subscriber to *Michigan Farmer* magazine including prior to July 13, 2016, and that Informa publishes *Michigan Farmer*.  Informa lacks knowledge or information sufficient to form a belief as to whether Mr. Gottsleben purchased his subscription while residing in Michigan, and thus denies the allegations in the fourth sentence of paragraph 17.  Except as specifically admitted, Informa denies each and every other allegation in this paragraph.

 18. Defendant Informa Media, Inc. f/k/a Penton Media, Inc. is a Delaware corporation with its headquarters and principal place of business in New York, New York.  Informa does business throughout Michigan and the entire United States.  Informa is the publisher of various magazines, newsletters, and other publications, including but not limited to *American Agriculturist, Beef, Beef Vet, California Farmer, Corn & Soybean Digest, Dakota Farmer, Delta Farm Press, Feedstuffs, Farm Industry News, Farm Futures, Indiana Prairie Farmer, Kansas Farmer, Mid-South Farmer, Missouri Ruralist, Nebraska Farmer, National Hog Farmer, Ohio Farmer, Prairie Farmer, Carolina-Virginia Farmer, Southeast Farm Press, Southern Farmer, Southwest Farm Press, The Farmer, The Farmer-Stockman, Wallaces Farmer, Western Farm Press, Western Farmer- Stockman, Wisconsin Agriculturist, and Michigan Farmer.*

 **ANSWER:** Informa admits only that it is a Delaware corporation with its headquarters and principal place of business in New York, New York, and that it publishes the following magazines and newsletters (but not all in paper form): *American Agriculturist, Beef, Beef Vet, California Farmer,*

*Corn & Soybean Digest, Dakota Farmer, Delta Farm Press, Feedstuffs, Farm Industry News, Farm Futures, Hay & Forage Grower, Indiana Prairie Farmer, Kansas Farmer, Mid-South Farmer, Missouri Ruralist, Nebraska Farmer, National Hog Farmer, Ohio Farmer, Prairie Farmer, Carolina-Virginia Farmer, Southeast Farm Press, Southern Farmer, Southwest Farm Press, The Farmer, The Farmer-Stockman, Wallaces Farmer, Western Farm Press, Western Farmer- Stockman, Wisconsin Agriculturist, and Michigan Farmer.*  Except as specifically admitted, Informa denies each and every other allegation in this paragraph.

### JURISDICTION & VENUE

19.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

**ANSWER:**    This paragraph states legal conclusions to which no response is required.  To the extent a response is required, denied. Further answering, Informa denies that this action should be certified as a class action and denies the alleged amount in controversy.

20.    The Court has personal jurisdiction over Informa because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *Michigan Farmer* subscription in Michigan, Informa's direction of such *Michigan Farmer* subscription into Michigan, and Informa's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Private Reading Information, including his residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan.  Personal jurisdiction also exists over Informa in Michigan because Informa conducts substantial business within Michigan, such that Informa has significant, continuous, and pervasive contacts with the State of Michigan.

**ANSWER:**    This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa denies that the court has personal jurisdiction over it for the

**PAGE 12**

reasons stated in this paragraph. That is, Informa denies the factual averments forming the basis of the legal conclusion.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, Informa does substantial business in this judicial District, Informa is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

**ANSWER:**    This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa denies the factual allegations forming the purported bases for proper venue.

FACTUAL ALLEGATIONS

22.    In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens.  Simon and Leahy, respectively).

**ANSWER:**    Informa lacks information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.  S. Rep. No. 100-599 at 7–8 (1988) speaks for itself. To the extent the allegations state a legal conclusion, no response is required.

23.    Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

**ANSWER:**    Informa admits that the PPPA was enacted as a privacy statute. Informa disputes that the statute applies to "certain types of sensitive consumer information."  To the extent the allegations state a legal conclusion, no response is required. Otherwise, denied.

24.    Subsection 2 of the PPPA states:

PAGE 13

> [A]     person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting,
> or lending books or other written materials . . . *shall not*
> *disclose* to any person, other than the customer, a record
> or information concerning the purchase . . . of those
> materials by a customer that indicates the identity of the
> customer.

PPPA § 2 (emphasis added).

**ANSWER:**    The allegations in this paragraph state a legal conclusion to which no response is required.  Informa further states that the PPPA speaks for itself and respectfully refers the court to the same.

25.    Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

**ANSWER:**    Informa admits only that this paragraph purports to recite a quote from S. Rep. No. 100–599, and respectfully refers the court to same for the complete record, context and applicability to this case.  Informa denies that there have been any privacy violations or that the statement is otherwise applicable to the facts of this case and denies each and every other allegation in this paragraph.

26.    As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

**ANSWER:**    Informa admits only that this paragraph purports to recite a quote from 134 Cong. Rec. S5399 (May 10, 1988), and respectfully refers the court to same for the complete record,

**PAGE 14**

context and applicability to this case.  Informa denies that there have been any privacy violations or that the statement is otherwise applicable to the facts of this case and denies each and every other allegation in this paragraph.

27.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id*.

**ANSWER:**     Informa lacks information sufficient to form a belief about the truth of the reasons behind Senator Leahy's purported statements, or what they refer to, and thus the allegations in this paragraph are denied as phrased.  To the extent the allegations state a legal conclusion, no response is required.

28.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit J**).

**ANSWER:**     Informa denies that the PPPA establishes the quoted principle "as a matter of law."  To the extent the allegations state a legal conclusion, no response is required.

29.     Despite the fact that thousands of Michigan residents subscribe to Informa's publications, Informa disregarded its legal responsibility by systematically violating the **PPPA**.

**ANSWER:**     Informa denies each and every allegation contained in this paragraph.

### THE PRIVATE INFORMATION MARKET:
### CONSUMERS' PRIVATE INFORMATION HAS REAL VALUE

30.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting

and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

**ANSWER:**    Informa lacks information sufficient to form a belief about the authenticity or truth of the allegations in this paragraph, and therefore denies them.

31.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

**ANSWER:**    Informa denies the conclusory allegation in this paragraph, which is an opinion, and also denies that Exhibit L supports such allegation.

32.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis—and profit.[5]

**ANSWER:**    Informa lacks information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit M, and therefore denies them.

33.    In fact, an entire industry exists while [sic] companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators

---

3    **Exhibit K**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at*  https://www.ftc.gov/sites/default/files/documents/ public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

4    *See* **Exhibit L**, Web's Hot New Commodity:  Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html    (last visited July 30, 2021).

5    **Exhibit M**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available  at*  https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

**PAGE 16**

then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

**ANSWER:**   Informa lacks information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit N, and therefore denies them.

34.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

**ANSWER:**   Informa lacks information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit O, and therefore denies them.

35.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

**ANSWER:**   Informa lacks information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit P, and therefore denies them.

---

6    *See* **Exhibit N**, Martha C. White, *Big Data Knows What You 're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

7    **Exhibit O**, Natasha Singer, *You for Sale:  Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/ GENERAL/GENPRESS/N120616S.pdf (last visited July 30, 2021).

8    **Exhibit P**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id= 3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

36.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[9]

**ANSWER:**     Informa lacks information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit Q, and therefore denies them.

37.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[10]

**ANSWER:**     Informa lacks information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit Q, and therefore denies them.

38.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Informa share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded

---

9     *See* **Exhibit Q**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

10     *Id.*

11     *See*     **Exhibit     R**,     Prize     Scams,     Federal     Trade     Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

**PAGE 18**

companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

**ANSWER:** Informa lacks information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibits R and S, and therefore denies them. Informa specifically denies the allegations about Informa's supposed data sharing practices.

39. Information disclosures like those made by Informa are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

**ANSWER:** Denied.

40. Thus, information disclosures like Informa's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

**ANSWER:** Denied.

41. Informa is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data

---

12 **Exhibit S**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times (May 20, 2007), *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

13 *Id*.

14 **Exhibit T**, *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

15 *See id*.

appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

**ANSWER:**    Denied.

42.    Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

**ANSWER:**    Informa lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, and therefore denies them.

### CONSUMERS PLACE MONETARY VALUE ON THEIR PRIVACY AND CONSIDER PRIVACY PRACTICES WHEN MAKING PURCHASES

43.    As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

**ANSWER:**    Informa lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, and therefore denies them.

44.    A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

**ANSWER:**    Informa lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit U, and therefore denies them.

---

16    *See* **Exhibit U**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidence   Report_US1.pdf (last visited July 30, 2021).

17    *Id*.

**PAGE 20**

45.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

**ANSWER:**    Informa lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, and therefore denies them.

46.    In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[18]

**ANSWER:**    Informa lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit V, and therefore denies them.

47.    These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[19]

**ANSWER:**    Informa lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit W, and therefore denies them.

---

18    *See* **Exhibit V**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a- price-on-their-personal-data.html (last visited July 30, 2021).

19    *See* **Exhibit W**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), discussed in European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

48.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]

**ANSWER:**    Informa lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and the conclusions drawn therein, including with respect to Exhibit X, and therefore denies them.

### INFORMA UNLAWFULLY RENTS, EXCHANGES, AND DISCLOSES ITS CUSTOMERS' PRIVATE READING INFORMATION

49.     Informa maintains a vast digital database comprised of its customers' Private Reading Information.  Informa discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each Informa customer, including his or her job title, number of employees, livestock type, sales volume, and farm annual income.  (*See, e.g.*, **Ex. A**).

**ANSWER:**    This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa denies each and every allegation in this paragraph.

50.     Informa then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts.  (*See* **Ex. A**).

**ANSWER:**    This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa denies each and every allegation in this paragraph.

---

20    *See* **Exhibit X**, Hann, *et al., The Value of Online Information Privacy:  An Empirical Investigation* (Oct. 2003) at 2, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi= 10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy.  It is obvious that people value online privacy.").

51.     Informa also discloses its customers' Private Reading Information to data cooperatives, who in turn give Informa access to their own mailing list databases.

**ANSWER:**     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa denies each and every allegation in this paragraph.

52.     As a result of Informa's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Informa that identify Informa's customers by their most intimate details such as their job title, number of employees, livestock type, sales volume, and farm annual income.  Informa's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

**ANSWER:**     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa lacks information sufficient to form a belief about what other companies do, and therefore denies those allegations. Informa denies each and every other allegation in this paragraph.

53.     Informa does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

**ANSWER:**     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa denies each and every allegation in this paragraph.

54.     During the relevant pre-July 31, 2016 time period, consumers purchased subscriptions to Informa's publications through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribed, Informa never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre- July 31, 2016 time period, Informa uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information.

**PAGE 23**

**ANSWER:**     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa admits only that it offers subscriptions through various channels.  Except as specifically admitted, Informa denies each and every other allegation in this paragraph.

55.     As a result, Informa disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to anybody willing to pay for it

**ANSWER:**     Denied.

56.     By and through these actions, Informa has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

**ANSWER:**     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Informa denies each and every allegation in this paragraph.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by Informa without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

**ANSWER:**     Informa admits that Plaintiff purports to certify a class as defined in this paragraph and seeks to exclude certain categories of individuals, but denies that such classes exist as to Informa or are otherwise certifiable.

58.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may

---

21     **Exhibit Y**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent Plaintiff's allegations are contrary to law or require a response, denied.

59. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Informa is a "retailer or distributor" of publications (i.e., magazines); (b) whether Informa obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading Information; and (c) whether Informa's disclosure of Plaintiff's and the Class's Private Reading Information violated the PPPA.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent Plaintiff's allegations are contrary to law or require a response, denied.

60. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading Information.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent Plaintiff's allegations are contrary to law or require a response, denied.

61. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent Plaintiff's allegations are contrary to law or require a response, denied.

62. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, denied.

## CAUSE OF ACTION

### Violation of Michigan's Preservation of Personal Privacy Act

### (PPPA § 2)

63.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER:**    Informa repeats and re-alleges the responses to paragraphs one (1) through sixty-two (62) of this Complaint as though fully set forth herein.

64.    Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Informa.

**ANSWER:**    Informa admits that Plaintiff purports to bring this claim individually and on behalf of the members of the class but denies that the case is certifiable.

65.    As a magazine publisher that sells subscriptions to consumers, Informa is engaged in the business of selling written materials at retail.  *See* **PPPA** § 2.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies them.

66.     By purchasing a subscription to *Michigan Farmer* magazine, Plaintiff purchased written materials directly from Informa.  *See* **PPPA** § 2.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies them.

67.     Because Plaintiff purchased written materials directly from Informa, he is a "customer" within the meaning of the **PPPA**.  *See* **PPPA** § 1.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies them.

68.     At various times during the pre-July 31, 2016 time period, Informa disclosed Plaintiff's Private Reading Information, which identified him as a *Michigan Farmer* customer, in at least three ways.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

69.     First, Informa disclosed mailing lists containing Plaintiff's Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Informa.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

70.     Second, Informa disclosed mailing lists containing Plaintiff's Private Reading Information to data cooperatives, who in turn gave Informa access to their own mailing list databases.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

**PAGE 27**

71.     Third, Informa rented and/or exchanged its mailing lists containing Plaintiff's Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer- facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

72.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Informa was able to increase its profits gained from the mailing list rentals and/or exchanges.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

73.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, Informa disclosed to persons other than Plaintiff records or information concerning his purchase of written materials from Informa.  *See* PPPA § 2.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies them.

74.     The information Informa disclosed indicates Plaintiff's name and address, as well as the fact that he subscribed to Michigan Farmer.  Accordingly, the records or information disclosed by Informa indicated Plaintiff's identity.  *See* PPPA § 2.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

75.     Plaintiff and the members of the Class never consented to Informa disclosing their Private Reading Information to anyone.

**PAGE 28**

**ANSWER:**    This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

76.    Worse yet, Plaintiff and the members of the Class did not receive notice before Informa disclosed their Private Reading Information to third parties.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

77.    Informa's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

78.    Informa's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their subscriptions.

**ANSWER:**    Informa lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

79.    Informa's disclosures of Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Informa's revenue.  Accordingly, Informa's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies each and every allegation in this paragraph.

80.     By disclosing Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, Informa violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits.  *See* PPPA § 2.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa denies them.

81.     As a result of Informa's unlawful disclosure of their Private Reading Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).  On behalf of himself and the Class, Plaintiff seeks:  (1) $5,000.00 to Plaintiff and each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

**ANSWER:**     This paragraph states a legal conclusion to which no response is required.  To the extent Plaintiff's allegations are contrary to law or require a response, Informa admits that Plaintiff seeks the relief sought in this Paragraph, but specifically denies that Plaintiff is entitled to such relief. Informa denies each and every remaining allegation in this paragraph.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act;

C.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

106643.00605/132291924v.6

D.      For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.      For prejudgment interest on all amounts awarded; and

F.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**ANSWER:**      Informa admits that Plaintiff is seeking the relief referenced in this paragraph, but denies that the requested relief is appropriate.   Informa denies every other allegation in this paragraph.

**JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

**ANSWER:**      Informa admits that Plaintiff has made a jury demand, but lacks knowledge or information sufficient to form a belief as to whether the jury demand is appropriate, and thus denies the allegations.

**AFFIRMATIVE DEFENSES**

As for additional defenses to the Complaint, and without assuming any burden of pleading or proof that would otherwise rest on Plaintiff, and reserving the right to amend this Answer to assert any additional defenses when, and if, in the course of its investigation, discovery, preparation for trial, or otherwise, it becomes apparent to assert such defenses, Informa alleges the following affirmative defenses:

**FIRST AFFIRMATIVE DEFENSE**

Plaintiff and the members of the putative class's claims are barred, in whole or in part, by the applicable statute of limitations. Among other things, the claims are time-barred based upon the stipulated dismissal, without prejudice, of a preceding putative class action.  *See DelValle v.*

**PAGE 31**

*Informa Media, Inc*, No. 22-00132 (W.D. Mich).  *See also China Agritech, Inc. v. Resh,* 138 S. Ct. 1800, 1806 (2018).[22]

## SECOND AFFIRMATIVE DEFENSE

Any alleged injury or damage sustained by Plaintiff or members of the putative classes were caused, in whole or in part, by the conduct of third parties who were not acting as Informa's agents and/or that was not ratified by Informa. In particular, NextMark and other list brokers could have obtained class lists without authorization and/or shared them with direct marketers without authorization.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff acted in bad faith and with unclean hands based on all relevant facts, law, and circumstances known by Plaintiff.  Accordingly, the claims are barred, in whole or in part, from any recovery in this action.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff and members of the putative class have waived their right to recover herein, in whole or in part, and/or their claims are barred by estoppel.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff and members of the putative class's claims are barred because there was notice and/or consent to disclose under the PPPA. Informa provided notice and an opportunity to opt out of data sharing for marketing purposes in its various consumer-facing forms including its applicable privacy policies. Plaintiff also assumed the risks for these same reasons.

---

[22] Defendant is aware that this Court has concluded that a six-year statute of limitations applies in an unrelated PPPA matter but does not concede that issue.  *See Krassick v. Archaeological Ins. of Am.*, 2022 WL 2071730, at *1 (W.D. Mich. June 9, 2022) (Jarbou, J.).

## SIXTH AFFIRMATIVE DEFENSE

The statutory penalties sought by Plaintiff and members of the putative classes are excessive and thus violate the Due Process Clause of the United States Constitution. In particular, due process limits aggregate statutory damages in class actions and the Michigan legislature recognized the due process concerns when it amended the statute to remove statutory damages in July 2016.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff and members of the putative class's claims are barred because they failed to mitigate damages by failing to opt-out of direct marketing.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff and the members of the putative class's claims are barred by the doctrine of laches. Plaintiff and putative class members have delayed in asserting their rights, well passed the previously recognized statute of limitations, and such delay has caused Informa to no longer possess potentially relevant documents and evidence.

## PRAYER FOR RELIEF

WHEREFORE, Informa denies that Plaintiff is entitled to any of the relief sought, and denies that any class can be certified in this action. Informa requests that the Court:

1. Dismiss this action with prejudice;

2. Enter judgment for Informa;

3. Dismiss the class claims;

4. Award Informa its costs, expenses, and attorney's fees incurred in defending this action; and

5. Grant such other and further relief as the Court deems just and proper.

DATED:  July 24, 2023                    Respectfully submitted,

                                         BLANK ROME LLP

                                         By: */s/ Ana Tagvoryan*
                                              Ana Tagvoryan
                                              ana.tagvoryan@blankrome.com
                                              Harrison Brown
                                              harrison.brown@blankrome.com
                                              2029 Century Park East, 6th Floor
                                              Los Angeles, CA 90067
                                              Tel.:  424.239.3400
                                              Fax:  424.239.3434

                                              Hilary F. Korman
                                              Hilary.korman@blankrome.com
                                              1271 Avenue of the Americas
                                              New York, New York 10020
                                              Tel: 212.885.5436
                                              Fax: 917.332.3854


                                              *Attorneys for Defendant*
                                              *INFORMA MEDIA, INC.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 24, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys or parties of record.

By: */s/ Ana Tagvoryan*
Ana Tagvoryan

106643.00605/132291924v.6